**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ASSET ALLOCATION AND | ) | |
| MANAGEMENT CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 4471 |
| | ) | |
| v. | ) | JUDGE DARRAH |
| | ) | |
| PHYSICIANS MUTUAL INSURANCE | ) | |
| COMPANY and PHYSICIANS LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF PHYSICIANS MUTUAL INSURANCE COMPANY
AND PHYSICIANS LIFE INSURANCE COMPANY IN SUPPORT OF THEIR
MOTION TO DISMISS**

Defendants, Physicians Mutual Insurance Company and Physicians Life Insurance Company (collectively "Physicians Mutual"), pursuant to the provisions of Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure have moved to dismiss the Complaint for Declaratory Judgment of Plaintiff Asset Allocation and Management Co., LLC ("AAM"). This memorandum is submitted in support of that motion.

**INTRODUCTION**

Physician Mutual's Motion presents the issue of whether a potential defendant can use the Declaratory Judgment Act as a tactical device to determine the forum for litigating a dispute between the parties. The law in the Seventh Circuit clearly counsels district courts to decline to exercise jurisdiction where, as here, a declaratory judgment action is filed to deprive the natural plaintiff of its choice of forum. Physicians Mutual is the natural Plaintiff whose choice of forum should be given deference. As more fully set forth below, following dismissal of Physician

Mutual's original action against AAM, Physicians Mutual refiled its action in the Circuit Court of Cook County, Illinois approximately three weeks after the dismissal of the original action and the initiation of the instant declaratory judgment proceedings. Declaratory relief is proper when a potential defendant is threatened with suit, but deprived of an opportunity to adjudicate its rights. The history of litigation between the parties, however, unequivocally demonstrates that such is not the case here. At all relevant times, Physicians Mutual has timely pursued litigation to resolve its claims against AAM. Consequently, there is no purpose to AAM seeking declaratory relief other than to deprive Physicians Mutual of its choice of forum. This action is an abuse of the Declaratory Judgment Act. This Court should decline to exercise jurisdiction and should dismiss AAM's Complaint for Declaratory Judgment.

## STATEMENT OF FACTS

1.      On September 21, 2006, Physicians Mutual filed an action in this Court (No. 06 C 5124) against AAM asserting claims for professional negligence, breach of fiduciary duty, breach of contract and fraud (hereinafter the "Federal Court Action"). *Complaint,* ¶ 7.

2.      The Federal Court Action was predicated on diversity of citizenship jurisdiction. *Complaint,* ¶ 7. On September 27, 2006, summary judgment was entered in favor of AAM. Physicians Mutual initiated an appeal to the Seventh Circuit. The Seventh Circuit questioned the basis for jurisdiction, however, and remanded the matter to the District Court to determine if diversity of citizenship existed between the parties. After several months of investigation, AAM concluded that the citizenship of its members at the time the Federal Court Action was filed could not be determined. *Complaint*, ¶ 7.

3.      On the motion of AAM, on August 7, 2008, this Court entered its Order dismissing, without prejudice, Physicians Mutual's Federal Court Action. *Complaint,* ¶ 7.

4.      On August 7, 2008, the same day that the Federal Court Action was dismissed, AAM filed this action seeking declaratory relief.[1]

5.      On August 29, 2008, approximately three weeks following dismissal of its Federal Court Action, Physicians Mutual refiled its claims against AAM in the Circuit Court of Cook County, Illinois.[2]

### ARGUMENT

### The Exercise of Jurisdiction would be
### Inconsistent with the Declaratory Judgment Act.

The purpose of the Declaratory Judgment Act, 28 U.S.C. § 2201, "is to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication, without waiting until his adversary should see fit to begin suit, after damage had accrued." *NUCOR Corp. v. Aceros y Maqilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 577 (7th Cir. 1994) (citation and quotation marks omitted). *See also M Credit, Inc. v. Cadlerock, L.L.C.*, No. 03 C 1690, 2003 WL 21800017, at *3 (N.D. Ill. July 31, 2003) (the Declaratory Judgment Act is designed to prevent "one party from continually accusing the other, to his detriment, without allowing the other to secure an adjudication of his rights by bringing suit") (Exhibit C); *Societe*

---

[1] AAM alleges in its Complaint for Declaratory Judgment that, subsequent to the filing of the Federal Court Action, it reorganized and that there now exists diversity of citizenship between the parties. *Complaint,* ¶ 8.

[2] Physicians Mutual requests that this Court take judicial notice of its State Court Complaint, a copy of which is attached hereto as Exhibit A.  The Court may take judicial notice of matters of public record without converting a Rule 12 Motion into a Motion for Summary Judgment. *See Big River Zinc Corp. v. Steel Dynamics, Inc.*, No. 06-208, 2006 WL 1886172 (S.D. Ill. July 7, 2006) (Exhibit B); *Hensen v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (permitting a district court to consider public documents filed in an earlier Indiana State Court case in deciding a Rule 12(b)(6) Motion to Dismiss).

*de Conditionnement en Aluminum v. Hunter Eng'g Co.,* 655 F.2d 938, 943 (9th Cir. 1981) (purpose is "to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure – or never"); *Océ-Office Sys., Inc. v. Eastman Kodak Co.,* 805 F. Supp. 642, 646 (N.D. Ill. 1992) ("[r]esolving the uncertainty and anxiety resulting from a looming lawsuit is, indeed, the purpose of the Declaratory Judgment Act").

District courts are afforded wide discretion to decline to hear actions that pursue only declaratory relief. *Personified, L.L.C. v. Sales Consultants of Cary, L.L.C.*, No. 08 C 3123, 2008 WL 3200842, at * 3 (N.D. Ill. Aug. 8, 2008) (Exhibit D). The Seventh Circuit has repeatedly stated that "declaratory relief is discretionary in a strong sense, but that is probably because it is often used to seize the forum from the natural plaintiff. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002); *Hoover v. Wagner*, 47 F.3d 845, 850 (7th Cir. 1995). In deciding whether to decline to exercise jurisdiction, courts are to consider which party is the "natural plaintiff." *Newell Operating Co. v. International Union of United Auto., Aerospace and Agr. Implement Workers of Am.*, 532 F.3d 583, 591 (7th Cir. 2008). Declaratory judgment actions that are designed to deprive the "natural plaintiff" of its choice of forum are improper and should be dismissed. *Id.* at 591 ("[w]e are usually wary of a declaratory-judgment action that is 'aimed solely at wresting the choice of forum from the natural plaintiff'"); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993) ("a suit for declaratory relief aimed solely at wresting the choice of forum from the 'natural' plaintiff will normally be dismissed and the case allowed to proceed in the usual way.").

In a recent opinion, this Court explained:

> Allowing a potential defendant to make a procedural preemptive strike robs the natural plaintiff of his ability to select his forum. *Eli's Chicago Finest*, 23 F. Supp. 2d at 909. Furthermore, prohibiting a race to the courthouse encourages settlement and discourages costly duplicate litigation. *Eli's Chicago Finest*, 23 F. Supp. 2d at 909. A potential defendant should not respond to accusations of a potential plaintiff by rapidly bringing a declaratory judgment suit in hopes of securing a favorable forum. *Eli's Chicago Finest*, 23 F. Supp. 2d at 909. Therefore, a declaratory judgment suit with the express purpose of wresting the choice of forum from the 'natural' plaintiff is generally dismissed, whereby the case can then proceed in the usual way. *M Credit, Inc. v. Cadlerock, L.L.C.*, 2003 WL 21800017 (N.D.Ill. 2003).

*Weber-Stephen Prods. Co. v. Gardena Norge A/S*, No. 03 C 5262, 2004 WL 422651, at *2 (N.D. Ill. Feb. 12, 2004) (Darrah, J.) (Exhibit E).

Federal courts should also consider the state's interest in deciding questions of state law. The dispute between the parties raises exclusively issues of state law. No federal question is presented. Such circumstance militates in favor of this Court declining to exercise jurisdiction. *See Beach Cove Assocs. v. Fire Ins. Co.,* 903 F. Supp. 959, 961 (D.S.C. 1995) ("there exists an interest in having the most authoritative voice speak on the meaning of applicable state law, and that voice belongs to the state courts when state law controls the resolution of the case") (citing *Mitcheson v. Harris*, 855 F.2d 235, 237 (4th Cir. 1992)); *see also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law").

There can be no question that AAM filed its Complaint for Declaratory Judgment as a "procedural preemptive strike" to deprive Physicians Mutual of its choice of forum. On the very same day that the Federal Court Action was dismissed, AAM filed the instant Declaratory

Judgment Action.  Thus, AAM was never in the untenable position of needing a declaratory relief to obtain an early adjudication of its rights.  Indeed, within a matter of three weeks, Physicians Mutual refiled its claims in the Circuit Court of Cook County, Illinois.  Courts within the Seventh Circuit do not follow the "first-in-time" rule where, as here, "the declaratory judgment action is filed first, in anticipation of litigation by the other party."  *M Credit*, 2003 WL 21800017, at *3; *Weber-Stephen Products*, 2004 WL 422651, at *2 ("the federal declaratory judgment is not a prize to the winner of the race to the court house"); *Illinois Blower, Inc. v. Deltak, L.L.C.*, No. 04 C 0341, 2004 WL 765187, at *3 (N.D. Ill. Apr. 7, 2004) ("courts disfavor a first-filed suit if that suit is an improper anticipatory filing") (Exhibit F).

The Declaratory Judgment Act is intended to afford a remedy to a party who is uncertain of his rights and needs an early adjudication so that he is not placed in the untenable position of having to wait and act at his own peril while his adversary decides to bring suit.  Thus, the central question presented by this Motion is whether the exercise of jurisdiction would be consistent with the purpose of the Declaratory Judgment Act.  The undisputed facts unequivocally establish that AAM has improperly used the Declaratory Judgment Act as a tactical device to determine the forum in which to litigate the dispute between the parties.  *See Stepan Co. v. Callahan Chem. Co.*, No. 07 C 2976, 2007 WL 2908818, at *2 (N.D. Ill. Oct. 3, 2007) (Darrah, J.) (a declaratory judgment "is not a way for a potential defendant to choose the time and forum of the dispute") (Exhibit G).  Moreover, given that there exists a pending state court action, AAM's claim for declaratory relief is redundant and unnecessary.  AAM seeks nothing more than a determination of the claims now before the state court.  Significantly, those claims present issues exclusively of state law.  The fact that Physicians Mutual originally elected to file suit in this Court should not change the analysis.  Upon dismissal of the Federal Court

Action, Physicians Mutual was free to refile its Complaint against AAM in any forum with proper jurisdiction. As the natural plaintiff, Physicians Mutual's choice of forum should be given deference. *See Warshawsky & Co. v. Arcata Nat'l Corp.,* 552 F.2d 1257, 1259 (7th Cir. 1977) ("a plaintiff's choice of forum was entitled to great weight and was not lightly to be disturbed"). AAM is not in need of declaratory relief. Its Complaint for Declaratory Judgment is improper, inconsistent with the purposes of the Declaratory Judgment Act, and unnecessary and redundant of the claims now pending in the state court action.

## CONCLUSION

Physicians Mutual respectfully requests that this Court decline to exercise jurisdiction and dismiss AAM's Complaint for Declaratory Judgment.

Dated: September 2, 2008                Respectfully submitted,


**PHYSICIANS MUTUAL INSURANCE COMPANY and PHYSICIANS LIFE INSURANCE COMPANY,**


  /s/ Arthur F. Radke
Arthur F. Radke
Kathleen E. Surowiec
DYKEMA GOSSETT PLLC
10 S. Wacker Drive, Suite 2300
Chicago, IL  60606
(312) 876-1700
(312) 627-6302 (fax)

   and

James J. Frost
McGRATH, NORTH, MULLIN & KRATZ PC LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, NE  68102

(402) 341-3070
(402) 341-0216 (fax)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 2nd day of September, 2008, I electronically filed the above foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Kenneth M. Kliebard
Howrey, LLP
321 North Clark Street, Suite 3400
Chicago, IL  60610
kliebardk@howrey.com


_____/s/ Arthur F. Radke_____

CHICAGO\2507046.4
ID\AFR

# EXHIBIT A

Firm No. 42297

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

PHYSICIANS MUTUAL INSURANCE ) 
COMPANY AND PHYSICIANS LIFE )
INSURANCE COMPANY, )
                                  )
          Plaintiffs, )
                                  )
vs. )
                                  )
ASSET ALLOCATION AND )
MANAGEMENT CO., LLC, )
                                  )
          Defendants. )

CASE NO.: _____

Jury Demanded

## COMPLAINT

Plaintiffs, Physicians Mutual Insurance Company ("Physicians Mutual") and Physicians Life Insurance Company ("Physicians Life") (collectively referred to as "Plaintiffs") complain against the Defendant, Asset Allocation and Management Co., LLC ("Asset Allocation") and allege as follows:

### PARTIES

1.    Physicians Mutual is a mutual insurance company organized and existing by virtue of the laws of the State of Nebraska with its principal place of business located in Omaha, Nebraska.

2.    Physicians Life is an insurance company organized and existing by virtue of the laws of the State of Nebraska with its principal place of business located in Omaha, Nebraska. Physicians Life is a wholly owned subsidiary of Physicians Mutual.

3.    Asset Allocation is a limited liability company organized and existing by virtue of the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. Asset Allocation's members are as follows:

a.   Schaefco, Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois

b.   Bravco is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.

c.   GlenEdwards, Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.

d.   Reed J. Inc. is a corporation organized and existing by virtue of the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.

e.   XK8, Inc. is an Illinois corporation with its principal place of business located in Chicago, Illinois.

f.   Trident AAM Holdings, Inc. is a corporation organized and existing by virtue of the laws of the State of Delaware with its principal place of business located in Greenwich, Connecticut.

## BACKGROUND

4.     Asset Allocation, organized in 1982, is a registered investment advisor specializing in the management of insurance company investment assets.  At all times relevant herein, Asset Allocation represented itself to Plaintiffs, as well as the public, as having specialized knowledge and expertise in the area of managing investment grade fixed income and convertible bond portfolios exclusively for insurance companies.

5.     Asset Allocation entered into separate but identical Investment Management Agreements with each Plaintiff dated October 1, 1983 pursuant to which Asset Allocation acted as an investment advisor to each Plaintiff.  True and correct copies of the respective Investment Management Agreements are attached hereto as *Exhibits "A"* and *"B"* and incorporated herein by this reference.

6.     On January 1, 2000, Asset Allocation entered into new Investment Management Agreements with Plaintiffs.  True and correct copies are attached hereto as *Exhibits "C"* and *"D"* and incorporated herein by this reference.

7.     The October 1, 1983 and January 1, 2000 Agreements are hereinafter collectively referred to as the "Investment Management Agreements."

8.     Pursuant to the terms of the Investment Management Agreements, Asset Allocation recommended to Plaintiffs the purchase and sale of securities and other transactions which Asset Allocation represented to be in the best interest of Plaintiffs.  Under the terms of the Investment Management Agreements, it was agreed by the parties that Asset Allocation would be liable to the Plaintiffs for the negligent acts and/or omissions of its agents, employees and professional consultants.

9.     At the recommendation of and in reliance on representations of Asset Allocation, Plaintiffs purchased participating interests in four (4) separate pools of mortgage loans (collectively the "Loan Participation Interests").  The underlying mortgage loans were insured by the Federal Housing Administration ("FHA") having been made for the purpose of financing construction of multi-family, low income or elderly housing projects under the National Housing Act.  Plaintiffs' Loan Participation Interests represented a direct ownership in the underlying mortgage loans and entitled Plaintiffs to their proportionate share of the principal and interest payments made on the underlying mortgage loans.

10.    One of the primary risks to an investor in investments such as the Loan Participation Interests is that the borrowers under the underlying mortgage loans may prepay those loans prior to the stated maturity of the loans.  This is a risk to the investor because it is most likely that the borrowers will repay when general interest rates have declined (to reduce

3

their interest expense). Thus, the investor will not receive the anticipated income to the end of the stated maturity forcing the investor to reinvest his funds at the then-prevailing lower interest rates. The existence of this "prepayment risk," therefore, has the effect of lowering the price an investor would be willing to pay for such an investment. To eliminate or reduce this prepayment risk, the lenders or re-sellers of such investments will typically require the borrowers to agree not to pre-pay the loan for a period of time or for the life of the loan. Such an agreement (typically referred to as "call protection," "lock out protection" or "prepayment protection") has the effect of raising the price of the investment (and lowering the effective interest rate), because the investments now have a more certain return. Conversely, an investment without such protection will command a much lower price. In addition, the prepayment risk is magnified in situations in which an investor has paid a premium over the par value of the investment. This situation occurs when the stated interest rate on the investment is higher than then prevailing interest rates for similar investments. If, for example, the stated interest rate on a original $1000 note with 10 years remaining is 15% but the prevailing interest rate for a similar $1000 10 year note is now 10%, the seller of the existing investment will be able to secure more than $1000 for the investment. In fact, because the investment will yield $150 per year, an investor would be willing to pay up to $1500 for the investment because at that point the investment would be yielding the same 10% annual return as the equivalent new investment. Where a prepayment risk exists, however, the investment will not command such a premium. If, for example, the investment is prepaid after one year, the investor will not get his $1500 back, he will only receive the $1000 as stated in the investment contract. Thus, the investor without prepayment protection runs the risk of (1) having to reinvest his returned principal at lower prevailing interest rates and (2) losing all or part of the premium he paid for the investment. Investments without

prepayment protection are much riskier and less valuable than equivalent investments with such protection.

11.    In connection with Plaintiffs' initial investment in Greystone 95-4, Lawrence R. Zeno of Asset Allocation represented in writing to Plaintiffs on or about February 14, 1996 that:

a.    That FHA Project mortgage loans [the underlying mortgage loans] were typically 40-year final maturity amortizing loans.

b.    That "prepayment lockouts were in place on all loans for the life of the loans" which would serve to eliminate the risk of prepayment of the loans in the event of falling interest rates.

c.    That historically there was a "very low incidence" of default on FHA Project Loans.

With each subsequent investment, Mr. Zeno orally reaffirmed that there existed "call protection" or "prepayment lockouts" in place for either the full or a substantial part of the life of the underlying loans.   Mr. Zeno's representations were made by telephone to Jerry Coon, Plaintiffs' Senior Vice President and Assistant Treasurer, on or near the dates of Plaintiffs' investment purchases as identified in Paragraph 16 below.

12.    Because the underlying mortgage loans were made at a time when interest rates were at historically high levels, the contractually fixed interest rate on each Loan Participation Interest was higher than the then prevailing interest rate at the time of Physicians' purchases.  In reliance on the recommendations and representations of Asset Allocation that prepayment protection existed, Plaintiffs paid a substantial premium over and above the par value of each Loan Participation Interest, in the aggregate an amount in excess of $7,000,000.

13.    Contrary to the representations of Asset Allocation, and unbeknownst to Plaintiffs, the underlying mortgage loans had little or no remaining prepayment protection at the time of each Plaintiffs' investments and/or were materially different than represented to Plaintiffs. Consequently, at all relevant times, the underlying loans were at substantial risk of being prepaid prior to maturity.

14.    The price of mortgage backed investments is also partly a function of the anticipated "normal" default and prepayment risks.  Unknown to Plaintiffs, at the time of Plaintiffs' investments, regulatory changes to HUD Section 8 programs were also expected.  The regulatory changes which were being proposed for HUD's Section 8 subsidy program created a significant greater risk of default and/or prepayment of the mortgage loans underlying Plaintiffs' Loan Participation Investments.  Unknown to Plaintiffs, analysts in the investment community were sounding alarms that changes to HUD's Section 8 rent subsidy program would cause massive redemptions of investments like those which are the subject matter of this action. Ordinary due diligence expected of an investment advisor would include evaluation of the risk of regulatory change.  Prior to making its investment recommendations to Plaintiffs, Asset Allocation failed to make any investigation into the regulatory climate at HUD insofar as it might implicate the Loan Participation Interests.  At the time of making its investment recommendations, Asset Allocation was completely unaware of the expected regulatory changes at the resultant impact of these changes on the risk of prepayment of the underlying loans.

15.    Had the Plaintiffs been informed of the absence of prepayment protection and/or the risk of prepayment or default due to expected changes in HUD's Section 8 subsidy program, they would not have purchased the Loan Participation Interests or would have paid a substantially lower price for them.  As a result of the actions and omissions of Asset Allocation,

Plaintiffs purchased the Loan Participation Interests at a purchase price which far exceeded their true market value.

16.    The particulars of each of Plaintiffs' Loan Participation Investments, including settlement date of purchase, par value, purchase price, stated maturity date of each loan and call date are set forth below:

| Settlement Date | Purchaser | Project | Par Value | Purchase Price | Stated Maturity | Date Called |
|---|---|---|---|---|---|---|
| 02/20/1996 | Physicians Mutual | Greystone 95-4 | 4,993,281.50 | 6,983,572.30 | 06/01/2024 | 05/29/2003 |
| 02/28/1996 | Physicians Life | Greystone 96-1 | 2,000,000.00 | 2,291,250.00 | 05/01/2018 | 09/25/2002 |
| 02/28/1996 | Physicians Mutual | Greystone 96-1 | 5,000,000.00 | 5,728,125.00 | 05/01/2018 | 09/25/2002 |
| 11/26/1996 | Physicians Life | Greystone 96-6 | 4,000,000.00 | 5,475,000.00 | 06/01/2024 | 05/28/2003 |
| 11/26/1996 | Physicians Mutual | Greystone 96-6 | 1,000,000.00 | 1,368,750.00 | 06/01/2024 | 05/28/2003 |
| 02/26/1999 | Physicians Life | Union Plaza | 2,956,641.39 | 3,585,389.66 | 07/01/2026 | Prepayment Lockout Expired 4/1/06 |
| 02/26/1999 | Physicians Mutual | Union Plaza | 6,898,829.91 | 8,365,909.23 | 07/01/2026 | Prepayment Lockout Expired 4/1/06 |
| 09/28/2000 | Physicians Mutual | Greystone 95-4 | 2,163,040.79 | 2,551.177.90 | 06/01/2024 | 05/29/2003 |

17.    In approximately late 2001, Asset Allocation became aware of the risk of early redemption of Plaintiffs' Loan Participation Interests.  After the premature redemption of Plaintiffs' Loan Participation Interests in the Greystone 96-1 Program, Asset Allocation undertook to investigate the redemption transactions on behalf of Plaintiffs and other clients of Asset Allocation.  Following its investigation, Asset Allocation represented to Plaintiffs that the underlying loans had restructured or refinanced under HUD's OHMAR Program, which they represented was an acceptable reason for early redemption.  Contrary to Asset Allocation's representations, the redemptions in the Greystone 96-1 Program were not the result of HUD-

mandated restructurings or refinancings. Instead, the loans were purchased by Greystone Servicing Corporation and/or related entities in violation of the relevant loan servicing agreements. Asset Allocation failed to adequately investigate, discover and advise Plaintiffs of the true nature and circumstances of the Greystone 96-1 redemptions. Had Asset Allocation properly investigated the early redemptions in the Greystone 96-1 Program and accurately informed Plaintiffs, Plaintiffs could have taken appropriate steps to protect their Loan Participation Interests in the Greystone 96-1 and remaining Greystone programs.

## COUNT I
### (Professional Negligence)

18.     Plaintiffs incorporate paragraphs 1 through 17 as if fully set forth herein.

19.     In its capacity as an investment advisor to Plaintiffs, Asset Allocation had a duty to use reasonable care, skill and diligence ordinarily possessed and exercised by investment advisors in similar circumstances.

20.     Asset Allocation breached its duty to exercise reasonable care, skill and diligence in its services rendered to Plaintiffs in the following particulars:

a.     By failing to competently investigate and discover the prepayment terms and provisions of the mortgage loans and/or related documents underlying each of Plaintiffs' investments prior to making purchase recommendations to Plaintiffs.

b.     By misrepresenting to Plaintiffs that there existed call protection or prepayment lockouts for the life, or substantially all of the life, of the mortgage loans underlying each of Plaintiffs' investments.

c. By failing to accurately inform the Plaintiffs of the prepayment rights and provisions of the mortgage loans and/or related documents underlying each of Plaintiffs' investments.

d. By making investment recommendations to Plaintiffs without knowledge and/or recklessly not knowing the prepayment rights and provisions of the mortgage loans and/or related documents underlying each of Plaintiffs' investments.

e. By failing to competently investigate, discover and/or inform Plaintiffs of the prepayment risk resulting from proposed revisions to HUD's Section 8 rent subsidy program dubbed the "mark to market" program.

f. By failing to investigate, discover and accurately inform Plaintiffs of the true facts and circumstances surrounding the redemption of Plaintiffs' loan participation interests in the Greystone 96-1 program.

21. The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

22. As a direct and proximate result of Asset Allocation's breach of duty, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

## COUNT II
### (Breach of Fiduciary Duty)

23. Plaintiffs incorporate by reference paragraphs 1 through 22 as if fully set forth herein.

24. At all times relevant herein, Plaintiffs reposed complete confidence and trust in Asset Allocation to thoroughly investigate, evaluate and recommend appropriate fixed term and other investments to Plaintiffs in accordance with its role as investment advisor. As Plaintiffs'

investment advisor, Asset Allocation had fiduciary obligations to Plaintiffs which included the duties to exercise good faith, loyalty, honesty and fairness in all dealings with the Plaintiffs and to fully and completely investigate and disclose all material facts relating to investment recommendations given to Plaintiffs and the early redemption of Plaintiffs' loan participation interests.

25.    The acts and/or omissions of Asset Allocation as alleged herein constitute a breach of its fiduciary duty.

26.    The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

27.    As a direct and proximate result of Asset Allocation's breach of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

## COUNT III
### (Breach of Contract)

28.    Plaintiffs incorporate by reference herein paragraphs 1 through 27 as if fully set forth herein.

29.    The acts and/or omissions of Asset Allocation as alleged herein constitute a material breach of the Investment Advisor Agreements.

30.    As a direct and proximate result of Asset Allocation's breach of the Investment Advisor Agreements, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

## COUNT IV
### (Fraud)

31.    Plaintiffs incorporate by reference herein paragraphs 1 through 30 as if fully set forth herein.

32.     In connection with each of Plaintiffs' investments, Asset Allocation falsely, fraudulently, and with intent to deceive represented to Plaintiffs that there existed "prepayment lockouts" and/or "call protection" on all of the mortgage loans underlying their investments for the life or a substantial part of the life of the loans.

33.     In connection with each of Plaintiffs' investments, Asset Allocation failed to disclose the true prepayment rights and provisions of the underlying mortgage loans, including the risks of prepayment resulting from proposed revisions to HUD's Section 8 subsidy program.

34.     The prepayment rights and provisions of the underlying mortgage loans were material to Plaintiffs' investment decisions and caused Plaintiffs to pay a substantial premium over and above par value.

35.     In reliance on the misrepresentations and omissions of Asset Allocation, Plaintiffs purchased the subject securities.

36.     The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

37.     As a direct and proximate result of Asset Allocation's acts and/or omissions, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.00.

### COUNT V
### (Fraud)

38.     Plaintiffs incorporate by reference paragraphs 1 through 37 as if fully set forth herein.

39.     Following its investigation of the early redemption of Plaintiffs' Loan Participation Interests in the Greystone 96-1 Program, Asset Allocation falsely, fraudulently and

with intent to deceive, represented to Plaintiffs that the underlying loans in said Program had restructured or refinanced under HUD's OHMAR Program.

40.    Asset Allocation failed to disclose that the underlying loans in the Greystone 96-1 Program were actually purchased by Greystone Servicing Corporation and/or related entities in violation of the terms of the relevant loan servicing agreement.

41.    In reliance on the misrepresentations and omissions of Asset Allocation, Plaintiffs were unknowledgeable as to the true facts and deprived of the opportunities to take appropriate action to protect their investments in the Greystone Programs.

42.    The acts and/or omissions of Asset Allocation as alleged herein were willful and wanton and in deliberate disregard of the rights of Plaintiffs.

43.    As a direct and proximate result of Asset Allocation's acts and/or omissions, Plaintiffs have suffered damages in an amount to be determined at trial but in excess of $75,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant as follows:

        a.    For compensatory, consequential and any other damages to the full extent allowed by law.

        b.    For punitive or exemplary damages as permitted by law;

        c.    For attorneys fees, costs and other expenses as permitted by law.

        d.    For the costs of this action.

        e.    For such other and further relief as the Court deems just and proper.

**PHYSICIANS MUTUAL INSURANCE
COMPANY and PHYSICIANS LIFE
INSURANCE COMPANY,** Plaintiffs

By:_____

Arthur F. Radke
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606
(312)876-1700
(312)627-2302 (fax)
aradke@dykema.com

and

James J. Frost
McGrath, North, Mullin & Kratz, PC LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, NE 68102
(402)341-3070
(402)341-0216 (fax)
jfrost@mcgrathnorth.com

ATTORNEYS FOR THE PLAINTIFFS

13

Exhibit A

**EXHIBIT A**

## INVESTMENT MANAGEMENT AGREEMENT

AGREEMENT, dated as of the 1st day of October, 1983, by and between Asset Allocation and Management Company, a partnership having its principal place of business at Three First National Plaza, Suite 4150, Chicago, Illinois, 60602 (herein "AAM") and Physicians Life Insurance Company, located at 115 South 42nd Street, Omaha, Nebraska, 68131 (herein "Client").

In consideration of the promises set forth in this agreement, AAM and Client agree as follows:

1. <u>Authorization As Investment Adviser</u>. Subject to the terms and conditions set forth herein, Client hereby designates and appoints AAM as investment adviser for cash and securities listed in Exhibit A, which is attached hereto, and such other cash and securities as shall be subsequently contained in Client's account by reason of purchases, sales, exchanges, withdrawals, additions or otherwise. AAM shall recommend to Client purchases, sales and other transactions, including means of execution and determination of timing, which AAM deems to be in Client's best interest, but AAM shall act only with Client's approval or at Client's direction, except as hereinafter provided.

2. <u>Reports</u>. AAM shall prepare and deliver to the Client periodic reports which shall list all assets in Client's account.

3. <u>Advisory Fees</u>. For the services rendered hereunder, Client shall pay the quarterly advisor fee to AAM set forth in its schedule of compensation current from time to time. Upon sixty (60) days prior written notice to Client, AAM may amend or change its schedule of compensation. If this Agreement is terminated by either party other than on the last day of a quarter, the advisory fee for

such quarter shall be based on the ratio that the number of days that have expired in such quarter bears to 90.

4. <u>Terms of Agreement</u>. This Agreement shall be effective as of the date of this Agreement and shall continue in effect until terminated by either party upon thirty (30) days prior written notice.

5. <u>Limitation on Liability</u>. AAM may rely upon information reasonably believed by it to be accurate and reliable. It is understood and agreed that AAM will be liable to Client for negligence and omissions of AAM, its agents and employees, as well as professional consultants and others employed or used by AAM in the performance of this Agreement which causes injury or damage to Client. AAM agrees to indemnify and hold harmless Client against and from all liabilities and claims, including costs and attorneys' fees, arising out of AAM's negligence.

6. <u>No Assignment</u>. This Agreement and the rights and obligations hereunder shall not be subject to assignment, as that term is defined in the Investment Advisors Act of 1940, by AAM except with the written consent of Client.

7. <u>Selection of Brokers</u>. Where AAM places orders for the execution of transactions, AAM may select such brokers and dealers for execution on such markets and at such prices or commission rates as AAM determines in its good faith judgement to be in the best interests of Client. AAM may take into consideration in the selection of such brokers and dealers not only the available prices and rates of brokerage commissions, but also other relevant factors (such as, without limitation, execution capabilities and the value of its ongoing relationship with such brokers and dealers) without having to demonstrate that such factors are of a direct benefit to Client.

8. **Custodianship of Cash and Securities.** Under no circumstances shall AAM act as custodian for or hold Client's cash and securities. AAM may issue instructions to the custodian as may be appropriate in connection with the transactions initiated by AAM hereunder.

9. **Registration as Investment Adviser.** AAM represents that it is registered as an investment adviser under the Investment Advisers Act of 1940 and that, with respect to investment adviser services rendered to a covered employee benefit plan, AAM is a "fiduciary" as that term is defined under the Employee Retirement Income Security Act of 1974.

10. **Authorization.** Client represents that (a) the execution of and performance contemplated under this Agreement do not and will not violate or abridge any obligation or duty of Client, and, (b) this Agreement has been authorized by appropriate action and when executed and delivered will be binding upon Client in accordance with its terms, and (c) Client will deliver to AAM such evidence of such authority as AAM may reasonably require, either by way of a certified resolution or otherwise.

11. **Notification Regarding Change in Partnership.** AAM, a partnership, shall notify Client of any change subsequent to the date of this Agreement in the membership of the partnership. Such notification shall be made in writing with 20 business days after such change.

12. **Counterparts.** This Agreement may be executed in two or more counterparts each of which shall be deemed an original.

13. **Complete Agreement.** This Agreement contains the full agreement between AAM and Client and supercedes any and all agreements, oral or written, which may have been heretofore entered into between the AAM and Client.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year above written.

AAM:                          ASSET ALLOCATION AND MANAGEMENT COMPANY

                              BY: _____

CLIENT:                       PHYSICIANS LIFE INSURANCE COMPANY

                              BY: _____

—4—

# EXHIBIT A

## Cash and Securities

All Cash and securities other than common stock owned.

Exhibit B

**EXHIBIT B**

## INVESTMENT MANAGEMENT AGREEMENT

AGREEMENT, dated as of the 1st day of October, 1983, by and between Asset Allocation and Management Company, a partnership having its principal place of business at Three First National Plaza, Suite 4150, Chicago, Illinois, 60602 (herein "AAM") and Physicians Mutual Insurance Company, located at 115 South 42nd Street, Omaha, Nebraska, 68131 (herein "Client").

In consideration of the promises set forth in this agreement, AAM and Client agree as follows:

1.  Authorization As Investment Adviser.  Subject to the terms and conditions set forth herein, Client hereby designates and appoints AAM as investment adviser for cash and securities listed in Exhibit A, which is attached hereto, and such other cash and securities as shall be subsequently contained in Client's account by reason of purchases, sales, exchanges, withdrawals, additions or otherwise.  AAM shall recommend to Client purchases, sales and other transactions, including means of execution and determination of timing, which AAM deems to be in Client's best interest, but AAM shall act only with Client's approval or at Client's direction, except as hereinafter provided.

2.  Reports.  AAM shall prepare and deliver to the Client periodic reports which shall list all assets in Client's account.

3.  Advisory Fees.  For the services rendered hereunder, Client shall pay the quarerly advisor fee to AAM set forth in its schedule of compensation current from time to time.  Upon sixty (60) days prior written notice to Client, AAM may amend or change its schedule of compensation.  If this

-1-

Agreement is terminated by either party other than on the last day of a quarter, the advisory fee for such quarter shall be based on the ratio that the number of days that have expired in such quarter bears to 90.

4.  <u>Terms of Agreement</u>.  This Agreement shall be effective as of the date of this Agreement and shall continue in effect until terminated by either party upon thirty (30) days prior written notice.

5.  <u>Limitation on Liability</u>.  AAM may rely upon information reasonably believed by it to be accurate and reliable.  It is understood and agreed that AAM will be liable to Client for negligence and omissions of AAM, its agents and employees, as well as professional consultants and others employed or used by AAM in the performance of this Agreement which causes injury or damage to Client.  AAM agrees to indemnify and hold harmless Client against and from all liabilities and claims, including costs and attorneys' fees, arising out of AAM's negligence.

6.  <u>No Assignment</u>.  This Agreement and the rights and obligations hereunder shall not be subject to assignment, as that term is defined in the Investment Advisors Act of 1940, by AAM except with the written consent of Client.

7.  <u>Selection of Brokers</u>.  Where AAM places orders for the execution of transactions, AAM may select such brokers and dealers for execution on such markets and at such prices or commission rates as AAM determines in its good faith judgement to be in the best interests of Client.  AAM may take into consideration in the selection of such brokers and dealers not only the available prices and rates of brokerage commissions, but also other relevant factors (such as, without limitation, execution capabilities and the value of its ongoing relationship with such brokers and dealers) without having to

-2-

demonstrate that such factors are of a direct benefit to Client.

8. <u>Custodianship of Cash and Securities</u>. Under no circumstances shall AAM act as custodian for or hold Client's cash and securities. AAM may issue instructions to the custodian as may be appropriate in connection with the transactions initiated by AAM hereunder.

9. <u>Registration as Investment Adviser</u>. AAM represents that it is registered as an investment adviser under the Investment Advisers Act of 1940 and that, with respect to investment adviser services rendered to a covered employee benefit plan, AAM is a "fiduciary" as that term is defined under the Employee Retirement Income Security Act of 1974.

10. <u>Authorization</u>. Client represents that (a) the execution of and performance contemplated under this Agreement do not and will not violate or abridge any obligation or duty of Client, and, (b) this Agreement has been authorized by appropriate action and when executed and delivered will be binding upon Client in accordance with its terms, and (c) Client will deliver to AAM such evidence of such authority as AAM may reasonably require, either by way of a certified resolution or otherwise.

11. <u>Notification Regarding Change in Partnership</u>. AAM, a partnership, shall notify Client of any change subsequent to the date of this Agreement in the membership of the partnership. Such notification shall be made in writing with 20 business days after such change.

12. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts each of which shall be deemed an original.

13. <u>Complete Agreement</u>. This Agreement contains the full agreement between AAM and Client and supercedes any and all agreements, oral or written, which may have been heretofore entered into between the AAM and Client.

IT WITNESS WHEREOF, the parties have executed this Agreement on the day and year above written.

AAM:                              ASSET ALLOCATION AND MANAGEMENT COMPANY

                                  BY: _____

CLIENT:                           PHYSICIANS MUTUAL INSURANCE COMPANY

                                  BY: _____

—4—

## EXHIBIT A

### Cash and Securities

All cash and securities other than common stock owned.

Exhibit C

FEB-21-06   10:02   FROM-Physicians Mutual          402 633 1096        T-027   P.012/023   F-853

## INVESTMENT MANAGEMENT AGREEMENT     EXHIBIT C

THIS AGREEMENT, dated as of the 1ˢᵗ day of January 2000, by and between Asset Allocation & Management Company, L.L.C., an Illinois limited liability company having its principal place of business at Thirty North LaSalle Street, 35th Floor, Chicago, Illinois, 60602 (herein "AAM"), and Physicians Life Insurance Company, having its principal place of business at 2600 Dodge Street, Omaha, Nebraska 68131 (herein "Client").

In consideration of the promises set forth in this Agreement, AAM and Client agree as follows:

1.   **Authorization As Investment Advisor.**
Subject to the terms and conditions set forth herein, Client hereby designates and appoints AAM as investment adviser for the management of securities with regard to the securities listed in Exhibit A, which is attached hereto, and such other securities as shall be subsequently contained in Client's account by reason of purchases, sales, exchanges, withdrawals, additions or otherwise.  AAM shall recommend to Client purchases, sales and other transactions, including means of execution and determination of timing, which AAM deems to be in Client's best interest, but AAM shall act only with Client's approval or at Client's direction, except as hereinafter provided.

2.   **Advisory Fees.**
For its investment advisory services, AAM shall be compensated in accordance with its schedule of fees attached hereto, based on the average market value of the Client's account for the subject quarterly billing period.  In the event that Client withdraws or otherwise excludes any assets from the advisory services provided hereunder, and such action results in the reduction of the market value of Client's account to a level less than 75% of the market value at the end of the preceding quarterly billing period "the benchmark quarter", the advisory fee for each quarter thereafter shall be based on the greater of (i) the average market value of the Client's account for the benchmark quarter or (ii) the average market value for the current quarterly billing period.  If this Agreement is terminated by either party with an effective date other than the last day of the quarter, the advisory fee for such quarter shall be based on the ratio that the number of days that have expired in such quarter bears to ninety (90) days.

3.   **Term of Agreement.**
This Agreement shall be effective as of the date of this Agreement and shall continue in effect until terminated by either party upon three hundred and sixty five (365) days prior written notice.

AAM

FEB-21-06    18:02    FROM-Physicians Mutual    402 633 1086    T-027    P.013/029    F-553

## INVESTMENT MANAGEMENT AGREEMENT - Page 2

4.    **Limitation of Liability.**

Except for negligence or malfeasance, or violation of applicable law, neither AAM nor any of its employees, stockholders, or any officers, or directors shall be liable hereunder for any action performed or omitted to be performed or for any errors or judgments in connection with AAM's services rendered under this Agreement. The federal securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore, nothing herein shall in any way constitute a waiver or limitation of any rights which Client may have under any federal securities laws.

5.    **Selection of Brokers.**

Where AAM places orders for the execution of transactions, AAM may select such brokers and dealers for execution on such markets and at such process or commission rates as AAM determines in its good faith judgment to be in the best interests of Client. AAM may take into consideration in the selection of such brokers and dealers not only the available prices and rates of brokerage commissions, but also other relevant factors (such as, without limitation, execution capabilities and the value of its ongoing relationship with such brokers and dealers) without having to demonstrate that such factors are of a direct benefit to Client.

6.    **Custodianship of Cash and Securities.**

Under no circumstances shall AAM act as custodian for or hold Client's cash and securities. AAM may issue instructions to the client's custodian as may be appropriate in connection with the settlement of transactions initiated by AAM hereunder.

7.    **Notification Regarding Change in Company.**

AAM, a limited liability company, shall notify Client of any substantial change subsequent to the date of this Agreement in the ownership of the company. Such notification shall be made in writing.

8.    **No Assignment.**

This Agreement and the rights and obligations hereunder shall not be subject to assignment by AAM except with the written consent of Client.

AAM

FEB-21-06    10:03    FROM-Physicians Mutual                402 633 1006        T-027  P.014/023  F-659

## INVESTMENT MANAGEMENT AGREEMENT - Page 3

9.  **Authorization:**

Client represents that (a) the executions of and performance contemplated under this Agreement do not and will not violate or abridge any obligation or duty of Client, (b) this Agreement has been authorized by appropriate action and when executed and delivered will be binding upon Client in accordance with its terms, and (c) Client will deliver to AAM such evidence of such authority as AAM may reasonably require, either by way of a certified resolution or otherwise.

10. **Complete Agreement.**

This Agreement between Asset Allocation & Management Company, LLC and Client supersedes any and all agreements, oral or written, which may have been heretofore entered into between AAM and Client.

11. **Employees of AAM.**

Without the express prior written consent of AAM, Client shall not directly or indirectly employ or solicit for employment any employees of AAM, or its affiliates, during the term of this Agreement and for a period of 12 months after termination of the Agreement.

12. **Reports.**

AAM shall prepare and deliver to Client periodic reports which shall list all assets in Client's account.



FEB-21-06    18:08    FROM-Physicians Mutual                    402 898 1096        T-027    P.015/023    F-569

13.    Client hereby warrants that in accordance with its Board of Directors the following are empowered to approve recommendations made on behalf of Client by AAM:

Name: _RR Ronson_____    Title _EVP & CEO_____

Name: _Roger D Wunson_____    Title _SENIOR - VICE PRESIDENT_

Name: _J Coon_____    Title _Sr. Vice President & Ass't Treas_

Name: _R A Reed_____    Title _Pres - CEO_____

IN WITNESS WHEREOF, the parties have executed this Agreement on the day, month, and year above written.

AAM:                    ASSET ALLOCATION & MANAGEMENT COMPANY, L.L.C.

By: _____
        Andrew M. Varmel, Chief Executive

CLIENT:                Physicians Life Insurance Company

By: _R A Reed_____

AAM

FEB-21-06    18:03    FROM-Physicians Mutual                402 539 1096        T-027  P.016/023  F-553

# Physicians Life Insurance Company
## Fee Schedule

|  | PLIC General (Includes Annuity Surplus) | PLIC – Annuity |
|---|---|---|
| First $10 Million Market Value | 25 bps | 31.25 bps |
| $10–100 Million Market Value | 5.5 bps | 6.875 bps |
| $100+ Million Market Value | 2.5 bps | 3.125 bps |

All private placement securities acquired after January 1, 2000, will be billed at a rate of 18 bps acquisition fee and 4 bps maintenance. Maintenance for private placement securities acquired prior to January 1, 2000 will be billed at 5 bps.

Note: PLIC General and PMIC General assets will be consolidated for billing purposes.

Page 16 of 23 received on 2/21/2006 5:07:46 PM [Central Standard Time] on server APPS2.

AAM

FEB-21-06   18:03   FROM-Physicians Mutual          402 633 1906      T-927   P.017/023   F-568

## Physicians Life Insurance Company
### Exhibit A

Securities held in the following custodial safekeeping accounts:

### The Northern Trust Company:

| | |
|---|---|
| 2636984 | Physicians Life – V500 |
| 2644761 | Physicians Life – Pledge Account |
| 2650173 | Physicians Life – Annuity V9 |
| 2655854 | Physicians Life – V500II |
| 2667512 | Physicians Life – Vista 5/7 |
| 2667513 | Physicians Life – Vista 10 |
| 2667510 | Physicians Life – Annuity Surplus |
| 2667509 | Physicians Life Insurance Company |

### The First National Bank of Omaha:

| | |
|---|---|
| 1051478599 | Physicians Life Insurance Company |



Exhibit D

FEB-21-06    10:04    FROM-Physicians Mutual    402 939 1096    T-027  P.018/023  F-553

## INVESTMENT MANAGEMENT AGREEMENT            EXHIBIT D

THIS AGREEMENT, dated as of the 1st day of January 2000, by and between Asset Allocation & Management Company, L.L.C, an Illinois limited liability company having its principal place of business at Thirty North LaSalle Street, 35th Floor, Chicago, Illinois, 60602 (herein "AAM"), and Physicians Mutual Insurance Company, having its principal place of business at 2600 Dodge Street, Omaha, Nebraska 68131 (herein "Client").

In consideration of the promises set forth in this Agreement, AAM and Client agree as follows:

1.    **Authorization As Investment Advisor.**
Subject to the terms and conditions set forth herein, Client hereby designates and appoints AAM as investment adviser for the management of securities with regard to the securities listed in Exhibit A, which is attached hereto, and such other securities as shall be subsequently contained in Client's account by reason of purchases, sales, exchanges, withdrawals, additions or otherwise. AAM shall recommend to Client purchases, sales and other transactions, including means of execution and determination of timing, which AAM deems to be in Client's best interest, but AAM shall act only with Client's approval or at Client's direction, except as hereinafter provided.

2.    **Advisory Fees.**
For its investment advisory services, AAM shall be compensated in accordance with its schedule of fees attached hereto, based on the average market value of the Client's account for the subject quarterly billing period. In the event that Client withdraws or otherwise excludes any assets from the advisory services provided hereunder, and such action results in the reduction of the market value of Client's account to a level less than 75% of the market value at the end of the preceding quarterly billing period "the benchmark quarter", the advisory fee for each quarter thereafter shall be based on the greater of (i) the average market value of the Client's account for the benchmark quarter or (ii) the average market value for the current quarterly billing period. If this Agreement is terminated by either party with an effective date other than the last day of the quarter, the advisory fee for such quarter shall be based on the ratio that the number of days that have expired in such quarter bears to ninety (90) days.

3.    **Term of Agreement.**
This Agreement shall be effective as of the date of this Agreement and shall continue in effect until terminated by either party upon three hundred and sixty five (365) days prior written notice.



FEB-21-06   19:04   FROM-Physicians Mutual      402 633 1096    T-827   P.019/023   F-663

## INVESTMENT MANAGEMENT AGREEMENT - Page 2

4. **Limitation of Liability.**

Except for negligence or malfeasance, or violation of applicable law, neither AAM nor any of its employees, stockholders, or any officers, or directors shall be liable hereunder for any action performed or omitted to be performed or for any errors or judgments in connection with AAM's services rendered under this Agreement. The federal securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore, nothing herein shall in any way constitute a waiver or limitation of any rights which Client may have under any federal securities laws.

5. **Selection of Brokers.**

Where AAM places orders for the execution of transactions, AAM may select such brokers and dealers for execution on such markets and at such process or commission rates as AAM determines in its good faith judgment to be in the best interests of Client. AAM may take into consideration in the selection of such brokers and dealers not only the available prices and rates of brokerage commissions, but also other relevant factors (such as, without limitation, execution capabilities and the value of its ongoing relationship with such brokers and dealers) without having to demonstrate that such factors are of a direct benefit to Client.

6. **Custodianship of Cash and Securities.**

Under no circumstances shall AAM act as custodian for or hold Client's cash and securities. AAM may issue instructions to the client's custodian as may be appropriate in connection with the settlement of transactions initiated by AAM hereunder.

7. **Notification Regarding Change in Company.**

AAM, a limited liability company, shall notify Client of any substantial change subsequent to the date of this Agreement in the ownership of the company. Such notification shall be made in writing.

8. **No Assignment.**

This Agreement and the rights and obligations hereunder shall not be subject to assignment by AAM except with the written consent of Client.

AAM

FEB-21-06    10:04    FROM-Physicians Mutual    402 633 1998    T-927    P.020/023    F-553

## INVESTMENT MANAGEMENT AGREEMENT - Page 3

9.    **Authorization:**

Client represents that (a) the executions of and performance contemplated under this Agreement do not and will not violate or abridge any obligation or duty of Client, (b) this Agreement has been authorized by appropriate action and when executed and delivered will be binding upon Client in accordance with its terms, and (c) Client will deliver to AAM such evidence of such authority as AAM may reasonably require, either by way of a certified resolution or otherwise.

10.    **Complete Agreement.**

This Agreement between Asset Allocation & Management Company, LLC and Client supersedes any and all agreements, oral or written, which may have been heretofore entered into between AAM and Client.

11.    **Employees of AAM.**

Without the express prior written consent of AAM, Client shall not directly or indirectly employ or solicit for employment any employee of AAM, or its affiliates, during the term of this Agreement and for a period of 12 months after termination of the Agreement.

12.    **Reports.**

AAM shall prepare and deliver to Client periodic reports which shall list all assets in Client's account.



FEB-21-06    10:04    FROM-Physicians Mutual      402 839 1096      T-027   P.022/023   F-553

## Physicians Mutual Insurance Company
### Fee Schedule

| | |
|---|---|
| First $10 Million Market Value | 25 bps |
| $10-100 Million Market Value | 5.5 bps |
| $100+ Million Market Value | 2.5 bps |

All private placement securities acquired after January 1, 2000, will be billed at a rate of 18 bps acquisition fee and 4 bps maintenance. Maintenance for private placement securities acquired prior to January 1, 2000 will be billed at 5 bps.

Note: PLIC General and PMIC General assets will be consolidated for billing purposes.

Page 22 of 23 received on 2/21/2006 5:07:43 PM [Central Standard Time] on server APPS2.

AAM

FEB-21-06   18:05    FROM-Physicians Mutual                 402 833 1006          T-027   P.025/028   F-563

### Physicians Mutual Insurance Company
### Exhibit A

Securities held in the following custodial safekeeping accounts:

#### The Northern Trust Company:
2667508      Physicians Mutual Insurance Company

#### The First National Bank of Omaha:
1051478601        Physicians Mutual Insurance Company

AAM

# EXHIBIT B



©Big River Zinc Corp. v. Steel Dynamics, Inc.
S.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
BIG RIVER ZINC CORPORATION, Plaintiff,
v.
STEEL DYNAMICS, INC., Defendant.
**Civil No. 06-208-GPM.**

July 7, 2006.

Rebecca R. Jackson, Terrence J. O'Toole, Bryan
Cave, St. Louis, MO, for Plaintiff.
Michael H. Michmerhuizen, Thomas A. Herr, Barrett
& McNagny LLP, Fort Wayne, IN, Gray M. Magee,
Robert H. Shultz, Jr., Heyl, Royster et al.,
Edwardsville, IL, for Defendant.

### *MEMORANDUM AND ORDER*

G. PATRICK MURPHY, Chief District Judge.
**\*1** Plaintiff Big River Zinc Corporation (Big River),
a Delaware corporation with its principal place of
business in Sauget, Illinois, is engaged in the
business of smelting zinc ore and processing the
metal into various end products. Defendant Steel
Dynamics, Inc. (SDI), an Indiana corporation with its
principal place of business in Indiana, fabricates and
sells a variety of carbon steel products. SDI operates
steel manufacturing plants in Butler and
Jeffersonville, Indiana. For several years, Big River
has sold quantities of zinc product to SDI for use in
the manufacture and fabrication of steel products. A
dispute has arisen in this business relationship,
causing Big River to file an action in this Court
seeking declaratory judgment in Count I and damages
in Count II. Additionally, SDI filed a related action in
Indiana state court, which was removed to the United
States District Court for the Northern District of
Indiana.[FN1] The facts as alleged in the complaint
before this Court are as follows.

> FN1. On March 15, 2006, six days after this
> action was filed, SDI filed an action in the
> DeKalb County Circuit Court captioned
> *Steel Dynamics, Inc. v. Big River Zinc
> Corporation,* Cause No. 17D02

0609PL0017.

On or about October 21, 2003, Big River and SDI
entered into agreements (the "October 21st
Agreements") whereby Big River would sell certain
quantities of zinc to SDI's Butler and Jeffersonville
facilities. The first of the two agreements, Contract
No. 90934 (the "Jeffersonville Agreement"), covered
sales of zinc to SDI's Jeffersonville facility and
provided for the shipment of 19,500 tons of zinc at an
approximate interval of 750 tons per month and at a
stated price of $0.47850 per pound. The second of the
two agreements, Contract No. 90936 (the "Butler
Agreement"), covered sales of zinc to SDI's Butler
facility and provided for the shipment of 21,600 tons
of zinc at an approximate interval of 1,200 tons per
month and at a stated price of $0.47850 per pound.
The October 21st Agreements contained identical
terms and conditions and, by their terms, the
Agreements expired on December 31, 2005.

Under ¶ 7 of the October 21st Agreements, each
shipment of zinc was to be treated as a separate sale.
The Agreements permitted SDI to forego delivery of
a particular month's allocation of zinc by notifying
Big River of its intent to decline that month's
delivery. If SDI elected to forego delivery, Big River
could opt to treat the sale as cancelled. Under ¶ 17 of
the Agreements, a cancelled sale would discharge
Big River from its obligation to deliver the declined
amount of zinc and reduce SDI's total obligation
under the October 21st Agreements. In reliance on
SDI's election to forego delivery in June, July, and
August of 2005 for the Jeffersonville facility and
June and July of 2005 for the Butler facility, Big
River treated declined shipments as cancelled sales
and reduced obligations under the October 21st
Agreements by approximately 4,650 tons, or
approximately $4,500,000 total sales. Nonetheless,
after the October 21st Agreements expired on
December 31, 2005, SDI demanded that Big River
deliver the declined tonnage at the price stated in the
Agreements. Big River refused to deliver the
declined tonnage, and SDI threatened to sue for
damages and specific performance. Big River has
denied and continues to deny liability to SDI for the
delivery of zinc.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 1886172 (S.D.Ill.)

*2 For the period December 27, 2005, through January 20, 2006, Big River shipped to SDI 392.7 tons of zinc at and for the December 2005 price of $0.87137 per pound and 1,088 tons of zinc at and for the January 2006 price of $0.99315 per pound. SDI paid for the shipments at a rate of $0.4785 per pound, but refused to pay the balance of $1,428,402.48, which Big River claims is still owed.

Big River seeks a declaratory judgment (Count I) that (1) it has no obligation to deliver the declined shipments and (2) SDI is obligated to indemnify it for damages, costs, and expenses incurred in bringing this action. Big River also seeks damages (Count II) in the amount of $1,428,402.48 under theories of account stated and unjust enrichment.

On May 10, 2006, SDI filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and attached several exhibits in support of its motion. SDI urges dismissal on two grounds: (1) Big River's complaint was filed solely to preempt SDI, which it contends is the natural plaintiff, of its choice of forum; and (2) Big River's claims for monetary damages are not supported by the pleadings or the exhibits. The exhibits attached to the motion support the second argument. Big River filed its response to the motion on May 26th, and SDI filed its reply on June 9th. The motion to dismiss currently is set for hearing on July 17, 2006.

On June 12th, Big River filed a Notification of Decision that the related Indiana action was dismissed without prejudice by the Honorable Roger B. Cosbey in an Opinion and Order dated June 9, 2006. In granting Big River's motion to dismiss, Judge Cosbey concluded that because the Butler Agreement contains a valid and enforceable Illinois forum selection clause and because the Jeffersonville Agreement, which lacks an agreed-upon forum selection clause, is "largely intertwined" with the Butler Agreement, the disputes arising under both Agreements must be litigated in Illinois. In light of Judge Cosbey's decision and for the reasons that follow, a hearing on SDI's motion to dismiss is not necessary.[FN2]

       FN2. Notably, SDI has not responded to Big River's Notification of Decision, in which Big River suggests that SDI's motion to dismiss is moot.

The standards governing a motion to dismiss under Rule 12(b)(6) are well-established. Such a motion tests the sufficiency of a plaintiff's complaint, but it does not decide the merits of a case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). A defendant's Rule 12(b)(6) motion will be granted if it is shown that the plaintiff has no legal claim under any possible interpretation of a set of well-pleaded facts. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 627 (7th Cir.1999); *Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 637 (7th Cir.2004). The motion will be denied if the plaintiff has alleged any set of facts upon which relief may be granted. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Moreover, a court will accept as true all well-pleaded factual allegations in the complaint and view those allegations, along with the inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *Flannery,* 354 F.3d at 637;*Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981).

*3 A court's inquiry is generally limited to the factual allegations contained within the four corners of the complaint. *Hill v. Trustees of Ind. Univ.,* 537 F.2d 248, 251 (7th Cir.1976). However, "if documents outside of the pleadings are placed before a district court, and not excluded, the court must convert the defendant's 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of his or her own."*Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993), *citing Carter v. Stanton,* 405 U.S. 669, 671 (1972) (per curiam); *Beam v. IPCO Corp.,* 838 F.2d 242, 244-45 (7th Cir.1988). Failure to make this conversion and to provide the parties with appropriate notice to submit additional evidentiary material can constitute reversible error.*Beam,* 838 F.2d at 244;*Jacobs v. City of Chicago,* 215 F.3d 758, 766 (7th Cir.2000). However, the filing of a Rule 12(b)(6) motion with documents outside of the four corners of the complaint does not automatically convert it into a summary judgment motion or require a district court to make such a conversion. *In re Wade,* 969 F.2d 241, 249 n. 9 (7th Cir.1992); *see also Maleski v. DP Realty Trust,* 162 F.R.D. 496, 498 (D.Pa.1995), *quoting*5A Wright and Miller, Federal Practice and Procedure § 1366 (2d ed. 1990) ("The court has complete discretion to determine whether or not to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                          Page 3
Not Reported in F.Supp.2d, 2006 WL 1886172 (S.D.Ill.)

accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.").

A district court's use of extrinsic evidence in deciding a Rule 12(b)(6) motion does not automatically convert the motion to one for summary judgment. The Seventh Circuit Court of Appeals has held that "the district court may also take judicial notice of matters of public record" without converting a Rule 12(b)(6) motion into a motion for summary judgment. *United States v. Wood,* 925 F.2d 1580, 1582 (7th Cir.1991); *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 284 (7th Cir.1994) (permitting a district court to consider public court documents filed in an earlier Indiana state court case in deciding a Rule 12(b)(6) motion to dismiss); *see also*FED.R.EVID. 201 ("A judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and "[a] court may take judicial notice, whether requested or not.").

The Court agrees with Big River that Judge Cosbey's decision moots the first issue raised by SDI in its motion to dismiss. SDI argues that Big River may not use a declaratory judgment action to deprive SDI of its choice of forum. As Judge Cosbey already has determined, however, SDI's chosen forum was improper under a valid and enforceable forum selection clause.[FN3]He further found that because Big River's action currently is pending in this Court, transfer of the action was not warranted because SDI "may simply assert the claims contained in the SDI complaint as counterclaims in the Illinois suit."Accordingly, the Court rejects SDI's argument that this action should be dismissed because it was filed to preempt SDI of its choice of forum.

> FN3. Judge Cosbey's finding on this issue binds this Court under the theory of collateral estoppel. *See In re Bridgestone/Firestone, Tires Prods. Liab. Litig.,* 333 F.3d 763, 767 (7th Cir.2003). For purposes of collateral estoppel, "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect. *Id., citing*Restatement (Second) of Judgments § 13 (1980).

*4 Next, SDI argues that Big River's claims for monetary damages are not supported by the pleadings or the exhibits. The Court will not consider any of the exhibits attached to Defendant's motion to dismiss that are not referred to in the complaint and, therefore, will not convert the motion to dismiss into one for summary judgment. *Cf. Venture Assocs. Corp.,* 987 F.2d at 431 (on a motion to dismiss, the Court may consider documents incorporated by reference to the pleadings without transforming the motion into one for summary judgment "if the documents are referred to in the complaint and are central to the plaintiff's claim").[FN4] This leaves the Court to determine whether Big River has a claim for monetary damages under any possible interpretation of the pleaded facts.

> FN4. The Court will consider the invoices dated February 14, 2006, which were attached to Defendant's motion to dismiss. The Court considers these invoices because they are referenced in Paragraph 19 of Big River's complaint and are central to Big River's claims.

In its complaint, Big River pleads damages under the theory of account stated or, alternatively, under the theory of unjust enrichment. SDI raises arguments that are properly resolved under Federal Rule of Civil Procedure 56, not Rule 12. Whether Big River "erroneously invoiced" certain shipments and whether the transactions were governed by the Agreements are issues that cannot be determined on a Rule 12 motion, and Big River's complaint is sufficient to state a claim under the liberal pleading standards applied in federal courts. As Judge Easterbrook has cautioned:

Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of. Doe has done that; it is easy to tell what she is complaining about. Any district judge (for that matter, any defendant) tempted to write "this complaint is deficient because it does not contain ..." should stop and think: What rule of law requires a complaint to contain that allegation? Rule 9(b) has a short list of things that plaintiffs must plead with particularity....

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2006 WL 1886172 (S.D.Ill.)

Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later. A complaint suffices if any facts consistent with its allegations, and showing entitlement to prevail, could be established by affidavit or testimony at a trial. *See, e.g., Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The consistency proviso is why some complaints may be dismissed pronto: litigants may plead themselves out of court by alleging facts that defeat recovery. *See, e.g., Walker v. Thompson,* 288 F.3d 1005 (7th Cir.2002). Complaints also may be dismissed when they show that the defendant did no wrong.

*Doe v. Smith,* 429 F.3d 706, 708 (7th Cir.2005). Illinois courts define an account stated as "an agreement between parties who have had previous transactions that the account representing those transactions is true and the balance stated is correct, together with a promise, express or implied, for the payment of such balance."*W.E. Erickson Constr., Inc. v. Congress-Kenilworth Corp.,* 477 N.E.2d 513, 519 (Ill.App.Ct.1985). Such an agreement is established "where a statement of account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection."*Allied Wire Prods., Inc. v. Marketing Techniques, Inc.,* 424 N.E.2d 1288, 1296-97 (Ill.App.Ct.1981). Under Big River's alternative unjust enrichment theory, in order to prevail under Illinois law, it must establish that: (1) it conferred a benefit on SDI; (2) SDI had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for SDI to retain the benefit without payment of its value. *Firemen's Annuity & Ben. Fund v. Municipal Employees', Officers' & Officials' Annuity & Ben. Fund,* 579 N.E.2d 1003, 1007 (Ill.App.Ct.1991). Big River's allegations are sufficient to state a claim upon which relief may be granted, and SDI clearly knows what Big River is claiming. SDI raises interesting arguments, but they must be raised in a properly filed Rule 56 motion. The Court will not consider them under Rule 12.

**\*5** For the foregoing reasons, SDI's motion to dismiss (Doc. 9) is **DENIED,** and the July 17th hearing thereon is **CANCELLED.**

**IT IS SO ORDERED.**

S.D.Ill.,2006.
Big River Zinc Corp. v. Steel Dynamics, Inc.
Not Reported in F.Supp.2d, 2006 WL 1886172 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT C



Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 21800017 (N.D.Ill.)

CM Credit, Inc. v. Cadlerock, L.L.C.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
M CREDIT, INC., Plaintiff,
v.
CADLEROCK, L.L.C, Cadlerock Properties, L.L.C.,
Cadlerock Joint Venture, L.P., and the Cadle
Company, Defendants.
**No. 03 C 1690.**

July 31, 2003.

*MEMORANDUM OPINION AND ORDER*

ASPEN, J.
*1 Plaintiff M Credit, Inc.[FN1] ("M Credit") has filed a declaratory judgment action against Defendants CadleRock, L.L.C., CadleRock Properties, L.L.C., CadleRock Joint Venture, L.P., and The Cadle Company (collectively, the "Cadle Companies"). Presently before us is the Cadle Companies' motion to dismiss M Credit's action. Also before us is M Credit's motion to enjoin prosecution of the Cadle Companies' complaint against M Credit in the United States District Court for the Northern District of Ohio. For the reasons set forth below, we grant the Cadle Companies' motion and deny M Credit's motion as moot.

> FN1. M Credit was formerly known as Transamerica Business Credit Corporation.

I. BACKGROUND

On August 18, 1999, M Credit sent a proposal letter ("Proposal Letter" or "Letter") to the Cadle Company regarding CadleRock Joint Venture's interest in financing. *See* Compl., Ex. 1. The Proposal Letter stated that M Credit "would consider establishing a three (3) year credit facility ... with an initial maximum commitment of $25,000,000," which M Credit could, at its discretion, expand by up to an additional $25,000,000 for a total of $50,000,000. The Letter indicated that M Credit, in its sole discretion, could extend the facility beyond the initial

three-year term and would so notify the borrower six months prior to the end of that three-year term.[FN2] The Letter stated that it "is not intended to and does not create any binding legal obligation on the part of [M Credit] or the Borrower and no obligation, express or implied ... is intended."Compl., Ex. 1 at 6. Furthermore, the Letter provides that it "is not, and is not to be construed as, a commitment, offer, agreement in principle or agreement ("Commitment") by [M Credit] to provide financing."*Id.* The Cadle Company signed and returned the letter to M Credit on August 19, 1999.

> FN2. The Proposal Letter indicates that it and the proposed financing it describes were "intended to be governed by and construed in accordance with Illinois law."Compl. Ex. 1 at 6.

On December 16, 1999, M Credit, as Lender, entered into a Loan and Security Agreement ("Loan Agreement" or "Agreement") with CadleRock and CadleRock Properties, as Borrowers. *See* Compl., Ex. 2. Under the Agreement, M Credit would establish certain credit facilities, pursuant to which M Credit could, in its discretion, make one or more term loans to the Borrowers. The Agreement provided that the maximum facility amount would be $25,000,000, unless M Credit, in its sole discretion, increased that amount to $50,000,000.

The Loan Agreement stipulated that it would expire on December 15, 2002 unless either M Credit or CadleRock and CadleRock Properties exercised an option to extend the term for an additional year. Upon the Agreement's expiration, "all of the Obligations shall be immediately due and payable and Lender shall have no obligation to make any Term Loans or other extensions of credit to or for the benefit of Borrowers."*Id.* at § 2.8(d). The Loan Agreement stated that it and loan documents referenced therein "EMBODY THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS, IF ANY, RELATING TO THE SUBJECT MATTER HEREOF."[FN3] *Id.* at § 10.16 (emphasis in original).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                  Page 2
Not Reported in F.Supp.2d, 2003 WL 21800017 (N.D.Ill.)

FN3. Section 10.12 of the Loan Agreement, attached to M Credit's complaint as Exhibit 2, expressly provides that it was made under and governed by Illinois law. The Cadle Companies irrevocably submitted to jurisdiction in the state and federal courts in Illinois, and venue in Cook County, Illinois. M Credit could, in its sole discretion, choose venue in any other state in a court of competent jurisdiction.

**\*2** M Credit made numerous loans for millions of dollars pursuant to the Loan Agreement. Neither party exercised the option to extend the Loan Agreement, allowing the Facilities to terminate on December 15, 2002. By letter dated March 4, 2003, Daniel C. Cadle, on behalf of the Cadle Companies, made a written demand that M Credit immediately lend CadleRock and CadleRock Properties an additional $25,000,000. *See* Compl., Ex. 3. The Cadle Companies promised to file suit if M Credit failed to meet their demands. The Cadle Companies explained:

By this letter, CadleRock, L.L.C. and CadleRock Properties, L.L.C. make demand on [M Credit] to perform under the August 18, 1999 letter and the December 16, 1999 Loan Agreement, and lend the sum of $25,000,000 to these companies immediately.

If [M Credit] refuses this demand, then we are prepared to proceed to court. Please see the enclosure (without exhibits) to this letter.

Please advise as to your intentions on receipt of this letter.

The enclosure to which the Cadle Companies' letter referred was a draft complaint bearing the caption "United States District Court for the Northern District of Ohio."*See* Mot. Dismiss. The fourteen-count draft complaint set forth allegations that M Credit acted in bad faith and breached loan agreements with the Cadle Companies. The draft complaint requested actual damages in excess of $75,000 and that M Credit specifically perform under the Proposal Letter to lend not less than § 25,000,000 to the Cadle Companies.

On March 7, 2003, M Credit filed a declaratory judgment action against the Cadle Companies in this

Court. The action seeks a judicial declaration that M Credit does not have a present obligation to lend money to the Cadle Companies. On April 4, 2003, the Cadle Companies filed a fourteen-count complaint against M Credit in the United States District Court for the Northern District of Ohio. *See* Mot. Dismiss, Ex. D. The complaint alleges that M Credit acted in bad faith and breached the Loan Agreement with the Cadle Companies by failing to approve certain term loans the Cadle Companies requested. The Cadle Companies request for relief includes actual damages in excess of $75,000 and M Credit's specific performance under the Proposal Letter to lend the Cadle Companies not less than $25,000,000.

II. ANALYSIS

The question presented by the Cadle Companies' motion is whether we should exercise jurisdiction over M Credit's claim for declaratory relief. It is well settled that, as a federal court, we have the discretion to decline to hear an action for declaratory relief, even though it is within our jurisdiction to do so. *See Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942); *see also Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 747 (7th Cir.1987). We must determine whether exercising jurisdiction would be consistent with the purposes of the Declaratory Judgment Act ("Act"), 28 U.S.C. § 2201. *See Cunningham Bros., Inc. v. Bail,* 407 F.2d 1165, 1168 (7th Cir.1965). The purpose of the Act "is to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication, without waiting until his adversary should see fit to begin suit, after damage has accrued."*Nucor Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.,* 28 F.3d 572, 577 (7th Cir.1994) (internal quotations and citations omitted).

**\*3** As the *Tempco* Court explained, the Act contemplates two "related but distinct fact situations" in which declaratory relief should be made available:

(1) The controversy has ripened to a point where one of the parties could invoke a corrective remedy (i.e. a suit for damages or an injunction) but has not done so; and

(2) Although the controversy is real and immediate, it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a decision. 819 F.2d at 749.

The suit before us falls within the first category. At the time M Credit filed this action, the Cadle Companies were in a position to commence a suit, but had not yet done so. In this situation, a declaratory judgment prevents "one party from continually accusing the other, to his detriment, without allowing the other to secure an adjudication of his rights by bringing suit." *Id.* at 749.

Here, however, the Cadle Companies have not "continually" accused M Credit to its detriment. The Cadle Companies' March 4, 2003 letter was the first and only occasion in which the Cadle Companies notified M Credit of the dispute regarding the scope and duration of M Credit's obligations under the Proposal Letter and Loan Agreement. The Cadle Companies requested that M Credit advise them as to its intentions upon receipt of the letter. The letter indicated that the Cadle Companies were prepared to proceed to court in the United States District Court for the Northern District of Ohio if M Credit refused the demand. Attached to the letter was a draft fourteen-count complaint against M Credit alleging breach of contract and bad faith. Thus, the Cadle Companies were not accusing M Credit of wrongdoing without affording it an opportunity to adjudicate its rights. Indeed, it appears to us that M Credit filed its action not to "avoid the accrual of avoidable damages," but rather to deprive the Cadle Companies of the opportunity to file its suit in the forum of its choice. *E. Edelmann & Co. v. Triple-A Specialty Co., 88 F.2d 852, 854 (7th Cir.1937)*. As discussed below, the Seventh Circuit expressly disfavors such a preemptive action.

Generally, when suits involving the same parties, facts, and issues are filed in two federal districts, the first case filed takes priority. *See Eli's Chicago Finest, Inc. v. The Cheesecake Factory, Inc., 23 F.Supp.2d 906, 908 (N.D.Ill.1998)* (citation omitted). However, the Seventh Circuit has never strictly applied the "first in time" rule. *See Tempco, 819 F.2d at 750;see also Chicago Furniture Forwarding Co. v. Bowles, 161 F.2d 411, 412 (7th Cir.1947)*. Furthermore, the Seventh Circuit has expressly disfavored applying the rule where, as here, the declaratory judgment action is filed first in

anticipation of litigation by the other party. *See Nucor, 28 F.3d at 577;Tempco, 819 F.2d at 750;Eli's Chicago Finest, 23 F.Supp.2d at 908;Natural Gas Pipeline Co. of America v. Union Pacific Resources Co., 750 F.Supp. 311, 313-314 (N.D.Ill.1990)*. As the Seventh Circuit has explained, "a suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural' plaintiff will normally be dismissed and the case allowed to proceed in the usual way." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 431 (7th Cir.1993)* (citation omitted).

**\*4** M Credit insists that we not dismiss its declaratory judgment action because it aims to resolve an issue not raised in the Cadle Companies' lawsuit - whether M Credit has a *present* obligation to make a new $25,000,000 loan to the Cadle Companies. M Credit concludes that its lawsuit would therefore better settle the controversy between the parties. In support of its conclusion, M Credit cites to *Nucor Corporation v. Aceros y Maquilas de Occidente, S.A. de C.V., 28 F.3d 572 (7th Cir.1994)*, in which the Seventh Circuit addressed the question of whether the district court properly entertained a declaratory judgment action Nucor, a steel manufacturer, filed against Aceros, a corporation that buys, sells, and processes steel. *See id. at 577.*Nucor filed its action in July 2001, one month after receiving a letter from Aceros describing Nucor's purported breach of contract and threatening to sue Nucor within sixty days under a Texas statute if Nucor did not pay Aceros' damages. *See id. at 575.*Aceros waited until March 1992, eight months after the filing of Nucor's action, before filing its state court action.

In the interim, Aceros filed a motion to dismiss Nucor's action. The district court denied Aceros' motion, explaining:

Here, another lawsuit between the parties involving identical issues has not been filed; yet, Aceros has clearly threatened suit against Nucor. Aceros' claim has ripened to a point where it could invoke a coercive remedy, but it has not done so. Aceros' assertion that it plans to bring suit is not enough. As memories fade, the facts become more difficult to determine. Accordingly, Nucor would be prejudiced by any delay. Nucor need not wait for Aceros to bring a coercive action. *Id.* at 578 (quoting District Court Order of 19 March, 1992).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

On appeal, Aceros asserted that the district court sanctioned a "race to the courthouse," permitting Nucor's declaratory action to preempt its state court action. *Id.* Rejecting Aceros' argument, the Seventh Circuit declared that "[t]here simply was no race to the courthouse" in light of Aceros' eight-month delay in filing its action. *Id.* Consequently, Aceros was unable to demonstrate that its action "would be a better remedy, or that the declaratory action was being used merely for procedural fencing."*Id.*

Here, unlike *Nucor,* another lawsuit between the parties involving identical issues has been filed. M Credit argues that the Cadle Companies' lawsuit only seeks M Credit's performance of a *past* obligation to make a $25,000,000 loan while its action seeks a declaration that it has no *past or present* obligation to make a new $25,000,000 loan. However, the resolution of M Credit's action and the Cadle Companies' lawsuit both turn on the duration and scope of M Credit's obligations under the Proposal Letter and the Loan Agreement. That M Credit filed its declaratory action first does not give it a "right" to choose a forum.[FN4] *See Tempco,* 819 F.2d at 749-50. Indeed, M Credit may raise its claim as an affirmative defense or counterclaim to the Cadle Companies' lawsuit. *See Natural Gas Pipeline,* 750 F.Supp. at 315. To otherwise adjudicate M Credit's declaratory action would be to undermine the purposes of the Act and condone a "race to the courthouse."

> FN4. M Credit argues that it did not engage in improper forum shopping by filing its action in the Northern District of Illinois because jurisdiction and venue are proper in this Court. We are not entertaining a motion regarding jurisdiction or venue. Rather, we are considering the Cadle Companies' motion to dismiss. M Credit should address its arguments regarding venue in a motion to transfer filed in the Northern District of Ohio. *See Tempco,* 819 F.2d at 750;*see also Eli's Chicago Finest,* 23 F.Supp.2d at 909. Even if, as M Credit argues, the Northern District of Illinois is the appropriate venue for the resolution of the issues presented by the parties' suits, M Credit is not justified in filing a declaratory judgment action for purposes of securing venue in this Court. If

that were not the case, "[t]he wholesome purpose of declaratory acts would be aborted by its use as an instrument of procedural fencing ... to choose a forum."*Id.* (quoting *American Automobile Ins. Co. v. Freundt,* 103 F.2d 613, 617 (7th Cir.1939)).

**\*5** M Credit denies that there was a "race to the courthouse," noting that the Cadle Companies did not file its lawsuit until nearly one month after M Credit filed its action before this Court. However, M Credit filed its declaratory judgment action before this Court on March 7, 2003, only three days after receiving the demand letter from the Cadle Companies. Thus, at the time M Credit filed its action, it knew that the Cadle Companies stood ready to file suit in the Northern District of Ohio. By filing first, M Credit attempted to deprive the Cadle Companies of the forum of its choice. The Cadle Companies' decision to file on April 4, 2003 leads us to conclude that a "race to the courthouse" existed between M Credit, a fast competitor, and the Cadle Companies, a slower competitor. We decline to reward M Credit for its victory in reaching the courthouse first. Instead, we acknowledge the Cadle Companies' choice of forum and dismiss M Credit's declaratory judgment action, thereby permitting the Cadle Companies' lawsuit "to proceed in the usual way."*Allendale Mut. Ins. Co.,* 10 F.3d at 431.

III. CONCLUSION

For the foregoing reasons, we grant the Cadle Companies' motion to dismiss and deny M Credit's motion to enjoin prosecution of the Ohio action as moot. It is so ordered.

N.D.Ill.,2003.
M Credit, Inc. v. Cadlerock, L.L.C.
Not Reported in F.Supp.2d, 2003 WL 21800017 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT D



Slip Copy                                                                                                                            Page 1
Slip Copy, 2008 WL 3200842 (N.D.Ill.)

Personified, LLC v. Sales Consultants of Cary, LLC
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
PERSONIFIED, LLC, Plaintiff,
v.
SALES CONSULTANTS OF CARY, LLC,
Defendant.
No. 08 C 3123.

Aug. 7, 2008.

Christopher R. Freeman, Matthew W. Walch, Latham
& Watkins, LLP, Chicago, IL, for Plaintiff.
Donald Joseph Mizerk, Brian D. Fergemann, Giel
Stein, Winston & Strawn, LLP, Chicago, IL, for
Defendant.

### *MEMORANDUM OPINION*

SAMUEL DER-YEGHIAYAN, District Judge.
**\*1** This matter is before the Court on Defendant Sales
Consultants of Cary, LLC's ("SCC") motion to
dismiss. For the reasons stated below, we grant the
motion to dismiss.

### BACKGROUND

Plaintiff Personified, LLC ("Personified") alleges
that on December 19, 2007, CareerBuilder LLC
("CareerBuilder"), the parent company to
Personified, filed an intent-to-use trademark
application for the mark "Personified" ("Mark"). On
March 24, 2008, RightFish, LLC, a subsidiary of
CareerBuilder, allegedly changed its name to
Personified and CareerBuilder assigned all rights to
the Mark to Personified. SCC is allegedly a search
and recruitment consulting company that provides
staffing services under the name "Personify."

According to Personified, SCC has accused
Personified of engaging in wrongful conduct by filing
the trademark application and using the Mark. SCC
also allegedly accused Personified of attempting to
confuse consumers and attempting to contact
customers of SCC. In a letter dated May 21, 2008

("Letter"), SCC allegedly demanded that Personified
withdraw its trademark application, cease using the
Mark, and pay SCC $100,000.00 in damages.

Personified brought the instant action, and includes in
the complaint one declaratory judgment claim.
Personified seeks a declaration stating that it has not
violated any federal trademark or unfair competition
laws. Personified also seeks a declaration stating that
it has not violated any Illinois or North Carolina
unfair competition laws. SCC moves to dismiss the
instant action, and Personified requests that we stay a
ruling on the motion.

### LEGAL STANDARD

In ruling on a motion to dismiss brought pursuant to
Rule 12(b) (6), the court must draw all reasonable
inferences that favor the plaintiff, construe the
allegations of the complaint in the light most
favorable to the plaintiff, and accept as true all well-
pleaded facts and allegations in the
complaint.*Thompson v. Ill. Dep't of Prof'l Regulation,
300 F.3d 750, 753 (7th Cir.2002); Perkins v.
Silverstein, 939 F.2d 463, 466 (7th Cir.1991).* In
order to withstand a motion to dismiss, a complaint
must allege the "operative facts" upon which each
claim is based. *Kyle v. Morton High Sch., 144 F.3d
448, 454-55 (7th Cir.1998); Lucien v. Preiner, 967
F.2d 1166, 1168 (7th Cir.1992).* A plaintiff is
required to include allegations in the complaint that
"plausibly suggest that the plaintiff has a right to
relief, raising that possibility above a 'speculative
level' " and "if they do not, the plaintiff pleads itself
out of court." *E.E.O.C. v. Concentra Health
Services, Inc., 496 F.3d 773, 776 (7th Cir.2007)*
(quoting in part*Bell Atlantic Corp. v. Twombly, ---
U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929
(2007)).* Under the current notice pleading standard
in federal courts a plaintiff need not "plead facts that,
if true, establish each element of a 'cause of
action....' " *See Sanjuan v. Amer. Bd. of Psychiatry
and Neurology, Inc., 40 F.3d 247, 251 (7th Cir.1994)*
(stating that "[a]t this stage the plaintiff receives the
benefit of imagination, so long as the hypotheses are
consistent with the complaint" and that "[m]atching
facts against legal elements comes later"). The
plaintiff need not allege all of the facts involved in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 3200842 (N.D.Ill.)

the claim and can plead conclusions. *Higgs v. Carver, 286 F.3d 437, 439 (7th Cir.2002)*; *Kyle,* 144 F.3d at 455. However, any conclusions pled must " 'provide the defendant with at least minimal notice of the claim,' " *Kyle,* 144 F.3d at 455 (quoting *Jackson v. Marion County,* 66 F.3d 151, 153-54 (7th Cir.1995)), and the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of [his] claims." *Perkins,* 939 F.2d at 466-67. The Seventh Circuit has explained that "[o]ne pleads a 'claim for relief' by briefly describing the events." *Sanjuan,* 40 F.3d at 251;*Nance v. Vieregge,* 147 F.3d 589, 590 (7th Cir.1998) (stating that "[p]laintiffs need not plead facts or legal theories; it is enough to set out a claim for relief").

### DISCUSSION

**\*2** Personified filed the instant action on May 30, 2008. SCC contends that shortly thereafter, on June 5, 2008, SCC brought an action against Personified in North Carolina ("North Carolina Action"). SCC contends that the subject matter at issue in the North Carolina Action is the same as in the instant action. SCC argues that Personified is engaging in forum shopping by attempting to have the dispute resolved in the instant court and that the court should dismiss the instant action.

### I. Subject Matter Jurisdiction

The Declaratory Judgment Act authorizes a federal court to " 'give declaratory judgments in a case of actual controversy within its jurisdiction, but it is not an independent grant of jurisdiction, rather jurisdiction must be predicated on some other statute.'"*Newell Operating Co. v. International Union of United Auto., Aerospace, and Agr. Implement Workers of America,* 532 F.3d 583, 2008 WL 2600795, at *3 (7th Cir.2008)* (quoting *Rueth v. EPA,* 13 F.3d 227, 231 (7th Cir.1993)). In the instant action, Personified's claim involves issues concerning liability under federal trademark and unfair competition statutes. (Compl.Par. 3). Therefore, this court has federal question subject matter jurisdiction.

### II. First-to-File Rule

SCC argues that Personified is not entitled to maintain an action in the Northern District of Illinois

merely because Personified filed the instant action before SCC initiated the North Carolina Action. Personified contends that it was not attempting to preempt SCC's filing, and that Personified was merely seeking to "prompt the adjudication of its rights" by bringing the instant action. (Ans.6). The Seventh Circuit has not "strictly adhered to the 'first-to-file' rule in deciding whether to retain jurisdiction or dismiss a declaratory-judgment action."*Newell Operating Co.,* 532 F.3d 583, 2008 WL 2600795, at *4. Thus, simply because Personified filed its case first, does not automatically result in retaining jurisdiction in this matter. Even though Personified initiated this action to prompt a resolution of the dispute with SCC, that does not foreclose a dismissal of the instant action to allow the dispute to be properly resolved in the North Carolina Action.

### III. Discretion to Decline to Exercise Jurisdiction

SCC argues that this court should decline to exercise its jurisdiction to hear the declaratory judgment claim in this case. Personified acknowledges that this court has discretion to decline to hear this action. (Ans.6). District courts are afforded " 'wide discretion' to decline to hear actions that pursue only declaratory relief."*Newell Operating Co.,* 532 F.3d 583, 2008 WL 2600795, at *6 (quoting *North Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 647 (7th Cir.1998)). In deciding whether to decline to hear such cases, a court should consider the "wisdom of allowing litigation to go forward in the" district court and consider which parties are the "natural plaintiffs." *Newell Operating Co.,* 532 F.3d 583, 2008 WL 2600795, at *7. The Seventh Circuit has indicated that a court should be "wary of a declaratory-judgment action that is 'aimed solely at wresting the choice of forum from the natural plaintiff.'"*Id.* (quoting in part *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 718 (7th Cir.2002)).

**\*3** Personified contends that this case should be heard in Illinois since its employees and relevant documents are located in Chicago. According to Personified, the dispute can be resolved more efficiently in Illinois. Personified also argues that it was forced to bring the instant action due to a "threat to its way of doing business" that was presented in the Letter. (Ans.9). While it is true that SCC made certain demands in the Letter, and indicated possible legal action if Personified did not comply with the

demands, Personified was not precluded from attempting to first discuss the matter with SCC instead of rushing to the courthouse to preempt an action by SCC. In fact, the Letter includes statements indicating that SCC would be willing to discuss a settlement. (Compl.Ex. 1, 2-3).

In the instant action, the natural plaintiff is clearly SCC. SCC is seeking to hold Personified liable for Personified's alleged improper use of the Mark and pleads trademark and unfair competition claims. Personified is merely attempting in this case to preempt SCC's claims and obtain a declaration indicating that Personified has not broken any laws. Although Personified makes references to the convenience of its employees, Personified acknowledges that it is already pursuing a motion to transfer in the North Carolina Action. Personified can raise issues such as the convenience of the parties in its motion to transfer, 28 U.S.C. § 1404(a), which can be considered by the court in the North Carolina Action. (Ans.10). Based upon the record before us, we are not convinced that it would be appropriate for the court to hear the instant case. Therefore, we decline to exercise jurisdiction as a matter of discretion and grant SCC's motion to dismiss.

*IV. Stay of Ruling*

Personified argues that even if this court decides to decline to hear this case, the court should stay its ruling. Personified claims that it has filed a motion to transfer in the North Carolina Action seeking to have the case transferred to the Northern District of Illinois. Personified requests that this court stay its ruling on the instant motion to dismiss until the court in the North Carolina Action has ruled on the motion to transfer. Personified argues that if the North Carolina Action is transferred to the Northern District of Illinois, Personified will likely include the declaratory judgment claim as a counterclaim. Personified contends that by avoiding the need to replead its declaratory judgment claim it will conserve the parties' resources. We disagree. Personified has not offered substantial justification to delay these proceedings when they are not properly before this court. This court has a duty to maintain its docket and resolve disputes in an efficient and expeditious manner and such goals will not be furthered if the instant action was allowed to remain stagnant, when the case can be resolved at its outset.

Even if the North Carolina Action is ultimately transferred to the Northern District of Illinois, it will not be a substantial hardship for Personified to replicate its claims in this case in a counterclaim. Therefore, we deny the request for a stay of the court's ruling.

### CONCLUSION

*4 Based on the foregoing analysis, we grant SCC's motion to dismiss and deny Personified's request for a stay of a ruling.

N.D.Ill.,2008.
Personified, LLC v. Sales Consultants of Cary, LLC
Slip Copy, 2008 WL 3200842 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT E



**C** Weber-Stephen Products Co. v. Gardena Norge A/S
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
WEBER-STEPHEN PRODUCTS CO., Plaintiff,
v.
GARDENA NORGE A/S, Gardena Danmark A/S, Gardena Nederland B.V., and Gardena Holding (AG) GmbH, Defendants.
**No. 03 C 5262.**

Feb. 12, 2004.

Richard M. Franklin, Shima S. Roy, Hillary Paige Krantz, Baker & McKenzie, Chicago, IL, for Plaintiff.
Thomas Aquinas Reynolds, III, David E. Koropp, Cynthia M. Kostelecky, Winston & Strawn LLP, Chicago, IL, Thomas Moore Lawson, Ann K. Crenshaw, Lawson & Silek, PLC, Winchester, VA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

DARRAH, J.
**\*1** Plaintiff, Weber-Stephen Products Co. ("Weber"), filed suit against Defendants, Gardena Norge A/S, Gardena Danmark A/S, Gardena Nederland B.V., and Gardena Holding (AG) GmbH (collectively "Gardena"), seeking monetary damages for breach of contract and a declaratory judgment determining that Weber is not liable to Gardena for any violations of law (including breach of contract, tortious interference, fraud, constructive fraud, conversion, conspiracy and violations of the Illinois Franchise Disclosure Act of 1987) arising out of its contractual duties and responsibilities with respect to the Norwegian, Danish or Dutch Distributor Agreements. Presently pending before the Court is Defendants' Motion to Dismiss.

*BACKGROUND*

A reading of Weber's Complaint, including the documents attached to the Complaint, as well as Gardena's Complaint filed in the United States District Court for the Western District of Virginia, supports the following summary of the alleged operative conduct of the parties.

On October 1, 1997, Weber and Gardena Norge entered into a Distributor Agreement pursuant to which Gardena Norway would be the exclusive distributor for specified Weber products for Norway. Weber and Gardena Danmark entered into a similar agreement on March 31, 1998. Weber and Gardena Holland also entered into such an agreement on September 1, 1999. The Norwegian Distributor Agreement was to expire on September 30, 2000; the Danish Distributor Agreement was to expire on August 31, 2000; and the Dutch Distributor Agreement was to expire on August 31, 2001.

On April 27, 2000, Weber notified Gardena Holding (AG) GmbH that it intended to terminate its contracts with Gardena and in the future would distribute its own products. Weber formed Weber Scandanavia A/S and Weber Nederland, B.V. to distribute said products.

On May 23, 2003, Virginia counsel for Gardena notified Weber in a letter that Gardena Holland would assert claims in the United States District Court for the Western District of Virginia against Weber arising out of the Norwegian Distributor Agreement, the Danish Distributor Agreement, and the Dutch Distributor Agreement on behalf of its subsidiaries, including Gardena Norge, Gardena Danmark, and Gardena Holland. The letter also invited Weber to discuss settlement of the issues before Gardena would file its claims and requested a response by June 30, 2003. Gardena received no response from Weber to this May 23rd letter. However, on June 25, 2003, Weber filed the instant complaint in the Circuit Court of Cook County. In July 2003, Gardena removed the case from the Circuit Court of Cook County to this Court.

On July 31, 2003, Gardena filed its own complaint in the United States District Court for the Western District of Virginia against Weber for breach of contract, tortious interference, fraud, statutory conspiracy, civil conspiracy, unjust enrichment,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 422651 (N.D.Ill.)

constructive fraud, and violation of the Illinois Franchise Disclosure Act of 1987 (fraud and wrongful termination of franchise agreement).

*ANALYSIS*

**2** Gardena argues that Weber has filed a declaratory action in this Court as a preemptive strike in anticipation of Gardena's lawsuit in the Western District of Virginia.

In general, federal courts have observed the "first to file" rule, under which the first suit filed receives priority. *See Natural Gas Pipeline Co. of Amer. v. Union Pac. Res. Co., 750 F.Supp. 311, 313 (N.D.Ill.1990)*(*Natural Gas* ). However, the Seventh Circuit has never adhered to this rigid "first to file" rule. *Natural Gas, 750 F.Supp. at 313.*

Federal courts have the discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction. *Tempco Elec. Heater Corp. v. Omega Eng'g., Inc., 819 F.2d 746, 747 (7th Cir.1987)*(*Tempco* ). Dismissal of a declaratory action is proper when, as a result of the pendency of another suit, the suit for declaratory relief will serve no useful purpose. *See Tempco, 819 F.2d at 747-49.* The federal declaratory judgment is not a prize to the winner of the race to the courthouse. *Tempco, 819 F.2d at 750.* This rule applies to declaratory judgment actions designed to preempt not only infringement suits but other lawsuits as well. *Natural Gas, 750 F.Supp. at 314.* When the accused party has not been unfairly deprived of an opportunity to adjudicate its rights, a declaratory judgment is unnecessary. *Eli's Chicago Finest, Inc. v. The Cheesecake Factory, Inc., 23 F.Supp.2d 906, 908 (N.D.Ill.1998)*(*Eli's Chicago Finest* ).

Allowing a potential defendant to make a procedural preemptive strike robs the natural plaintiff of his ability to select his forum. *Eli's Chicago Finest, 23 F.Supp.2d at 909.* Furthermore, prohibiting a race to the courthouse encourages settlement and discourages costly duplicate litigation. *Eli's Chicago Finest, 23 F.Supp.2d at 909.* A potential defendant should not respond to accusations of a potential plaintiff by rapidly bringing a declaratory judgment suit in hopes of securing a favorable forum. *Eli's Chicago Finest, 23 F.Supp.2d at 909.* Therefore, a declaratory judgment suit with the express purpose of

wresting the choice of forum from the 'natural' plaintiff is generally dismissed, whereby the case can then proceed in the usual way. *M Credit, Inc. v. Cadlerock, L.L.C., 2003 WL 21800017 (N.D.Ill.2003).*

In the instant case, Weber responded to Gardena's letter and threat of litigation by rapidly bringing its own declaratory judgment suit in its chosen forum. Weber argues that it filed its action because the Western District of Virginia is an inappropriate forum for Gardena's suit against Weber and also because the Virginia complaint is invalid on its face. These arguments are properly addressed to the Virginia federal court hearing the breach of contract action rather than in this declaratory judgment action.

Weber also asserts that since Weber's Illinois action against Gardena is not merely a declaratory judgment action, Gardena's motion should be dismissed. However, the fact that the declaratory judgment action also includes other claims for relief does not prevent its dismissal when the main purpose of the action is for declaratory relief, and any other claims can be brought as counterclaims in the other pending action. *Natural Gas, 750 F.Supp. at 314-15.*

**3** Weber also argues that this Court need not dismiss declaratory actions it deems inappropriately filed in contexts other than trademark infringement. However, "The rule set forth in *Tempco* (cited by this Court above) applies to declaratory judgment actions designed to preempt not only infringement suits, but other lawsuits as well."*Natural Gas, 750 F.Supp. at 314.* It is not controlling that the competing suits filed in this case are not trademark infringement actions.

Contrary to its arguments in this case, in 1993, Weber argued in opposition to a motion to stay that a delay of negotiations and a "race to the courthouse" as a means of forum shopping was inexcusable. *See Weber-Stephen Products Co. v. Ivy Mar Co., Inc., 1994 WL 11711 (N.D.Ill.)*(*Weber-Stephen Products* ). Weber argued, "Such conduct ... smacks of forum shopping and is exactly the type of equitable concern which mandates that exception be taken from the first-filed rule."*Weber-Stephen Products, 1994 WL 11711 (N.D.Ill.).* The court, in that case, agreed that the first-to-file rule was not compelling, and the motion to stay was denied. *Weber-Stephen Products, 1994 WL 11711 (N.D.Ill.).*

Not Reported in F.Supp.2d, 2004 WL 422651 (N.D.Ill.)

*CONCLUSION*

For the foregoing reasons, Gardena's Motion to Dismiss is granted.

N.D.Ill.,2004.
Weber-Stephen Products Co. v. Gardena Norge A/S
Not Reported in F.Supp.2d, 2004 WL 422651 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT F



CIllinois Blower, Inc. v. Deltak, L.L.C.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
ILLINOIS BLOWER, INC. Plaintiff,
v.
DELTAK, L.L.C. Defendant.
**No. 04 C 0341.**

April 7, 2004.

Thomas John Verticchio, Sheryl Lynn Jaffee, Patrick
Gerard Cooke, Patzik, Frank & Samotny, Ltd.,
Chicago, IL, for Plaintiff.
James M. Hoey, Clausen Miller P.C, Chicago, IL,
Steven K Champlin, Angela M Hall, Dorsey &
Whitney LLP, Minneapolis, MN, for Defendant.

*MEMORANDUM OPINION AND ORDER*

COAR, J.
**\*1** Before this court is Deltak's L.L.C.'s ("Deltak" or
"Defendant") motion to transfer venue to the District
Court of Minnesota pursuant to 28 U.S.C. § 1404 ("
§ 1404(a)") For the reasons set forth below, Deltak's
motion to transfer venue is GRANTED.

I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff, Illinois Blower, Inc. ("IBI") is an Illinois
corporation with its principal place of business in
Cary, Illinois. (Pl.Comp.¶ 2). IBI markets and sells
industrial equipment, including ventilation fans and
exhaust blowers.*Id.* Deltak is a Delaware limited
liability company with its principal place of business
in Plymouth, Minnesota. (Pl.Comp.¶ 3). Deltak
manufactures and sells heat recovery steam
generators ("HRSGs"), equipment that is used to
make use of waste heat generated by industrial
activities, such as electric power generation. (*See*
Deltak's Memo. in Support of Motion to Transfer
Venue, p. 1).

In early 2000, Deltak requested that IBI provide
specialized fans to be used at some of Deltak's
construction projects. (Pl.Comp.¶ 6). Consequently,

Deltak issued numerous purchase orders, which were
filled by IBI. *Id.* After designing and manufacturing
the fans according to Deltak's specifications, IBI
delivered them to the Deltak project sites. (Pl.Comp.¶
7). Deltak contends it received complaints from its
customers regarding work quality, and some of those
complaints related to the IBI fans. (Pl.Comp.¶ 8). IBI
agreed to assist Deltak in resolving the problems that
arose at its project sites. *Id.* To resolve those
problems, IBI negotiated a Fan Repair Agreement
("Agreement") with Deltak. (Pl.Comp.¶ 9). Under the
Agreement, Deltak agreed to pay and contends that it
did pay IBI certain sums and agreed to be responsible
for the costs of certain replacement materials. (*See*
Zack Aff.). Deltak contends that IBI promised that it
would design a complete and satisfactory solution to
the fan problems, and assume financial responsibility
for work associated with the problem. (*See* Fan
Repair Agreement) .[FN1]IBI contends that it did
provide Deltak with quality fans, parts and services,
yet never received compensation for theses services.
(Pl.Comp.¶¶ 10, 11). On December 15, 2003, Deltak
sent a letter to IBI regarding the invoices and IBI's
purported breach of the Agreement, (Zack Aff.). On
December 17, 2003, IBI responded to Deltak by
letter, demanding immediate payment of all allegedly
outstanding invoices. (Zack Aff.; *seealso* Hall Aff.;
Def. Ex. 2).

> FN1. The Fan Repair Agreement contains a
> choice of law and forum selection clause
> which states that "[t]his Agreement shall be
> governed by the laws of the State of
> Minnesota. Venue for any disputes arising
> hereunder, at Deltak's option, may be the
> Courts of the State of Minnesota."(*See* Fan
> Repair Agreement).

Each letter was responded to with subsequent legal
action. On January 13, 2004, Deltak served a
summons and complaint upon IBI, claiming breach
of the Fan Repair Agreement and breach of warranty,
and seeking a declaration of the Parties' rights under
the Agreement and purchase orders issued by Deltak.
(*See* Hall Aff.; Def. Exs. 3 and 4). On January 16,
2004, IBI filed the action currently before this Court
in the Northern District of Illinois. On January 24,
2004, IBI amended its Complaint in this Court

Not Reported in F.Supp.2d                                                                      Page 2
Not Reported in F.Supp.2d, 2004 WL 765187 (N.D.Ill.)

pursuant to Fed.R.Civ.P.15(a). Subsequently, Deltak's summons and complaint were filed in Minnesota State Court, Hennepin County District, on January 28, 2004. (*See* Hall Aff.; Def. Ex. 5). On February 11, 2004, IBI removed the case to the United States District Court for the District of Minnesota. (*See* Hall Aff.; Ex. 7). IBI answered Deltak's complaint on February 17, 2004. (*See* Hall Aff.; Ex. 9).

## II. ANALYSIS

**\*2** IBI and Deltak do not dispute that the claims, parties and relief sought in their respective suits do not differ in any material respect. However, the Parties do dispute whether the Minnesota action or the Illinois action should be considered "first filed", which is a significant factor in determining where this cause of action should proceed. Additionally, the Parties dispute whether this cause of action should be transferred pursuant to § 1404(a). Therefore, this Court will address: (1) which action was "first filed"; and (2) whether the Illinois action should be transferred to the District of Minnesota pursuant to § 1404(a).

### A. Which Action Was "First Filed" ?

It is undisputed that Deltak perfected service on Plaintiff in Minnesota State Court prior to IBI filing its Complaint in the Northern District of Illinois. However, IBI filed its Complaint in the Northern District of Illinois before Deltak filed its Complaint in Minnesota State Court. Therefore, the Court must determine, according to Eighth Circuit standards, whether a suit is filed after service is perfected, although no Complaint was filed before that service.[FN2]

> **FN2.** Pursuant to Minn.R.Civ.P. 3.01, a civil action is commenced against a defendant when the summons is served upon the defendant. Pursuant to Minn.R.Civ.P. 5.04, the summons and complaint are required to be filed within a reasonable time after service upon defendant(s).

"In cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case as a matter of federal comity."*Keymer v. Management Recruiters, Int'l Inc., 169 F.3d 501, 503*

n. 2 (8th Cir.1999) (*citingNorthwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1004-05 (8th Cir.1993*)). The "first filed rule" gives priority "to the party who first establishes jurisdiction" in order to conserve judicial resources and avoid conflicting rulings. *Id.*

There has been a dispute among the District Courts of the Eighth Circuits as to what actions "establish jurisdiction" for purposes of the first filed rule. Though authority exists for both positions, most courts consider the act of filing, rather than service, as determinative under the first filed rule.*Federal Cartridge Company v. Remington Arms Company, No. Civ. 03-6105, 2003 WL 23101805 at \*2.* (*citingHospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1163 (10th Cir.1982*) (use of date of filing of the complaint gives effect to Rule 3 of Federal Rules of Civil Procedure); *Slidell, Inc. v. Archer Daniels Midland Co., No. 02-4841, 2003 WL 22050776, at \* 5 (D.Minn. Sept.2, 2003)* (holding same).*ButseeRed Wing Shoe Co. v. B-JAYS USA, Inc., No. Civ. 02-257, 2002 WL 1398538 at \*2* (using service date as priority criterion).; *seealsoR.K. Dixon v. Dealer Marketing Services, 284 F.Supp.2d 1204, 1215 n. 14 (S.D.Iowa 2003)* (*citingMed-Tec Inc. v. Nomos Corp., 76 F.Supp.2d 962, 968 n. 3 (N.D.Iowa 1999)* for the proposition that "the first court in which jurisdiction attaches means the first court in which a civil action is properly commenced."). While the Eighth Circuit has not directly addressed the issue of when jurisdiction first attaches, it has referenced filing dates, as opposed to dates of service, when addressing the first-filed rule. *Federal Cartridge Company, 2003 WL 2310180 at \*2* (*citingNorthwest, 989 F.2d at 1005;Anheuser-Busch, Inc. v. Supreme Int'l Corp., 167 F.3d 417, 418-19, (8th Cir.1999*). Though a close case, the majority of Eighth Circuit precedent dictates that jurisdiction does not attach until a complaint is actually filed, even if service was perfected prior to the filing of that complaint. Therefore, because IBI's Complaint was filed prior to Deltak's Complaint, IBI's was the first filed.

**\*3** While the first-filed complaint is significant, the rule "is not intended to be rigid, mechanical, or inflexible."*Orthmann v. Apple River Campground, 765 F.2d 119, 121 (8th Cir.1985)*. In fact, the Seventh Circuit does not rigidly adhere to the first-filed rule. *Trippe Mfg. Co. v. American Power Conversion*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Corp.*, 46 F.3d 624, 629 (7th Cir.1995). The Court may allow second-filed actions to proceed where it is favored by the interests of justice. *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749-50 (7th Cir.1987). Additionally, courts disfavor a first-filed suit if that suit is an improper anticipatory filing. "A suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural' plaintiff will normally be dismissed and the case allowed to proceed in the usual way." *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 431 (7th Cir.1993) (*citing Tempco, 819 F.2d at 747*)). However, the Parties' submissions indicate that both IBI and Deltak may potentially have cognizable claims against the other; consequently, neither suit can be characterized as an improper anticipatory filing. Therefore, the Court will determine if any of the considerations of § 1404(a) mandate a transfer of this case to the District of Minnesota, even though IBI's Complaint was "first filed."

B. Motion To Transfer Venue

Pursuant to § 1404(a), a court may transfer a civil action, "for the convenience of the parties and witnesses, in the interest of justice." Transfer under § 1404(a) is appropriate if: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of parties and witnesses; and (3) transfer is in the interests of justice. *Barnes v. Rollins Carriage Services, Inc.*, 976 F.Supp. 767, 768 (N.D.Ill.1997). Whether a transfer is appropriate under § 1404(a) is left to the sound discretion of the trial court. *Bryant v. ITT Corp.*, 48 F.Supp.2d 829, 832 (N.D.Ill.1999) (*citing Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir.1989)); *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir.1986)). Deltak, the moving party, has the burden of showing that "the transferee forum is clearly more convenient." *Coffey, 796 F.2d at 219-20*. Deltak and IBI do not dispute that venue is proper in both this Court and the District of Minnesota. Therefore, this Court will address whether transfer is for the convenience of the parties and witnesses, and in the interests of justice.

Courts consider four factors in determining whether transfer is convenient for the parties and witnesses: (1) the plaintiff's choice of forum; (2) the site of material events; (3) the availability of evidence in each forum; and (4) the convenience of the parties

litigating in the respective forums. *Barnes, 976 F.Supp. at 768*. The second, third and fourth factors are relatively balanced between the parties, and weigh neither for nor against either IBI or Deltak. However, the first factor is significant to IBI. IBI's choice of forum is Illinois, which is also its home forum. In general, a party's choice of forum is given substantial deference, particularly if that choice is also the plaintiff's home forum. *Central States, Southeast and Southwest Area Pension Fund v. Salasnek Fisheries, Inc.*, 977 F.Supp. 888, 890 (N.D.Ill.1997). Therefore, IBI's choice of forum will be given substantial deference.

*1. Does Transfer Serve the Interests of Justice?*

**\*4** Whether a transfer under § 1404(a) will serve the interests of justice "embraces traditional notions of judicial economy rather than the private interests of the litigants and their witnesses." *Bryant, 48 F.Supp.2d at 834* (*quoting TIG Ins. Co. v. Brightly Galvanized Prod., Inc.*, 911 F.Supp. 344, 346 (N.D.Ill.1996)). The court makes several considerations, including whether litigants are more likely to receive a speedy trial in one district or the other, if the litigation is related to other litigation in either forum, and in a diversity action, having a federal judge try the case who is familiar with the applicable law. *Coffey, 796 F.2d at 221*. The interests of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Id. at 220*. Most significant is the final factor, having a judge try the case who is familiar with the applicable law. The contract between the Parties expressly provides that all disputes are to be resolved according to Minnesota law. While this Court is able to address disputes that arise under the laws of other states, the fact remains that a Minnesota District Court, who must deal with Minnesota law with a significantly greater frequency than this Court, has the opportunity to hear the Parties' dispute. Therefore, this weighs in favor of transfer to the District of Minnesota.

*2. Relevance of Forum Selection Clause*

A forum selection clause in a contract does not mandate a transfer of venue. *Newell Co. v. Lee*, 950 F.Supp. 864 (N.D.Ill.1997) (*citing Heller & Co. v. Godbe Co.*, 601 F.Supp. 319, 321, n. 2 (N.D.Ill.1984)). A court should consider a forum

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 765187 (N.D.Ill.)

selection clause as one of many factors to consider in deciding a motion to transfer venue. *Id.* (citing*G.H. Miller & Co. v. Hanes,* 566 F.Supp. 305, 307 (N.D.Ill.1983)). However, § 1404(a) may not be used to circumvent a valid forum selection clause. *Id.* (citing*Northwestern Nat. Ins. Co. v. Donovan,* 916 F.2d 372, 378 (7th Cir.1990))."The forum-selection clause ... should receive neither dispositive consideration ... nor no consideration."*Stewart v. Rioch,* 487 U.S. 22, 31, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). The forum selection clause at issue in this case provides: [t]his Agreement shall be governed by the laws of the State of Minnesota. Venue for any disputes arising hereunder, at Deltak's option, may be the Courts of the State of Minnesota." (*See* Fan Repair Agreement). In this particular circumstance, it is significant that the Fan Repair Agreement, which is at the heart of the Parties' dispute, elects Minnesota as the appropriate forum. Consequently, the fact that the Parties' forum selection clause elects Minnesota as the chosen forum for any disputes weighs in favor of transfer.

After a consideration of all factors, the balance tips in favor of transfer to the District of Minnesota. Though IBI was technically the first to file its Complaint, the split in the Eighth Circuit concerning when jurisdiction attaches makes this fact less significant. Further, IBI's selection of Illinois as the forum for suit has less significance in context of the Parties' forum selection clause. Additionally, the forum selection clause electing Minnesota, as well as the fact that Minnesota law governs the Parties' suits, makes it a more appropriate forum for adjudicating the Parties' disputes. Therefore, this Court will transfer this cause of action to the District of Minnesota, and allow that court to consolidate IBI's cause of action with Deltak's cause of action filed there.

III. CONCLUSION

**\*5** For the foregoing reasons, Deltak's motion to transfer venue to the Minnesota District Court is GRANTED.

N.D.Ill.,2004.
Illinois Blower, Inc. v. Deltak, L.L.C.
Not Reported in F.Supp.2d, 2004 WL 765187 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT G

Westlaw.

Slip Copy                                                                                             Page 1
Slip Copy, 2007 WL 2908818 (N.D.Ill.)

C Stepan Co. v. Callahan Chemical Co.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
STEPAN COMPANY, Plaintiff,
v.
CALLAHAN CHEMICAL COMPANY, Defendant.
**No. 07 C 2976.**

Oct. 3, 2007.

Andrea L. Caron, Brian W. Lewis, Paul T. Olszowka,
Wildman, Harrold, Allen & Dixon, Chicago, IL, for
Plaintiff.
Christopher R. Parker, Michael Best & Friedrich,
Chicago, IL, Douglas Fifield Johnson, Earp Cohn PC,
Cherry Hill, NJ, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

JOHN W. DARRAH, United States District Court
Judge.
**\*1** Plaintiff, Stepan Company, filed suit, alleging
unjust enrichment against Defendant, Callahan
Chemical Company. Defendant has moved to transfer
the case to the District of New Jersey pursuant to 28
U.S.C. § 1404(a) or, in the alternative, to stay
proceedings pending the outcome of a declaratory
judgment action filed by Defendant against Plaintiff
in that district.

### BACKGROUND

Defendant is a New Jersey corporation with its
principal place of business in Palmyra, New Jersey.
Plaintiff is a Delaware corporation with its principal
place of business in Northfield, Illinois. During the
period from September 1, 1995 to August 31, 1999,
Plaintiff purchased from Defendant substantial
amounts of sodium monochloracetate ("SMCA"), a
chemical used in making various consumer and
industrial cleaning products. The majority of the
SMCA sold by Defendant to Plaintiff, approximately
96 percent, was shipped from Defendant's facility in
New Jersey to Plaintiff's plant in New Jersey.

The remainder of the SMCA was shipped from
Defendant's facility in New Jersey to Plaintiff's plant
in Illinois. In connection with these sales, Defendant
visited, sent correspondence to and telephoned
Plaintiffs headquarters in Illinois. Defendant also
accepted payment drawn from Plaintiff's Illinois bank
account.

Defendant did not manufacture SMCA itself but,
rather, purchased the chemical from two other
companies before reselling it to Plaintiff. Defendant's
first supplier of SMCA was Hoechst GmbH, a
German company, which delivered SMCA to
Defendant from Hoechst's facility in New Jersey. At
some point, Hoechst sold its chemicals division to
Clariant Corporation, a Swiss company, which then
began delivery of SMCA to Defendant from
Clariant's South Carolina facility.

In the summer of 2001, the U.S. Department of
Justice disclosed that it had uncovered a price-fixing
conspiracy among manufacturers of SMCA and a
related chemical, monochloroacetic acid ("MCAA").
A federal class-action antitrust suit was brought
against SMCA and MCAA manufacturers, including
Hoechst and Clariant ("MCAA class action"). The
MCAA class action settled; and pursuant to the
settlement agreement, direct purchasers of SMCA
and MCAA received a portion of the settlement
proceeds based on their purchases made between
September 1, 1995 and August 31, 1999. Defendant
was awarded nearly $1.7 million and, after paying the
claims administrator's fee, received just over $1.1
million in net proceeds.

Plaintiff now brings this suit, alleging that Defendant
was unjustly enriched by the settlement agreement.
Plaintiff claims that Defendant "pass[ed] on to
Plaintiff the illegal overcharges imposed by the
conspiracy" and, therefore, was not itself injured by
the price-fixing conspiracy. Plaintiff contends that the
"refund" received by Defendant pursuant to the
MCAA settlement agreement is, therefore, an "unjust
windfall." Plaintiff seeks to "recover that portion of
Defendant's settlement agreement that is attributable
to the SMCA it re-sold to Plaintiff."

**\*2** Before this case was filed, Defendant brought suit

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                   Page 2
Slip Copy, 2007 WL 2908818 (N.D.Ill.)

in the U.S. District Court for the District of New
Jersey, seeking a declaratory judgment that Plaintiff
has no valid claim to any of the MCAA class-action
settlement proceeds and that Defendant has not been
unjustly enriched by its receipt of those proceeds.
Defendant now moves to transfer this case to the
District of New Jersey or, in the alternative, to stay
this case pending the outcome of the New Jersey
action.

## ANALYSIS

When duplicative cases are filed in different courts,
there is "a *presumption* that ... the first case should be
allowed to proceed and the second should be
abated." *Asset Allocation and Management Company
v. Western Employers Insurance Company, 892 F.2d
566, 573 (7th Cir.1989)* (emphasis original).
Defendant argues that as the first-filed case, the New
Jersey action should be given priority. However,
because Defendant's first-filed suit is an action for
declaratory judgment, admittedly filed in anticipation
of Plaintiff's suit, it is not entitled to priority on the
basis of being first in time. As the court of appeals
has noted, "the Declaratory Judgment Act 'is not a
tactical device whereby a party who would be a
defendant in a coercive action may choose to be a
plaintiff by winning the proverbial race to the
courthouse.' " *Hyatt International Corp. v. Coco,
302 F.3d 707, 712 (7th Cir.2002), quoting Terra
Nova Ins., Co., Ltd. v. Acer Latin Am., Inc., 931
F.Supp. 852, 854-55 (S.D.Fla.1996); see also
Friedman v. Geller, 925 F.Supp., 611
(E.D.Wis.1996)* (declaratory judgment "is not a way
for a potential defendant to choose the time and
forum of the dispute").

Defendant raises three arguments as to why the first-
filed rule should apply even though the New Jersey
case is an action for declaratory judgment. First,
Defendant asserts that this case has only a tenuous
connection to Illinois, given that the vast majority of
the chemical shipments at issue took place in New
Jersey. While this may be relevant to the analysis
under *28 U.S.C. 1404*(a) to the extent that it affects
the convenience of the parties or witnesses or the
interest of justice, it has no bearing on whether
Defendant's New Jersey action should be given
priority as a first-filed case. Second, Defendant
argues that it filed the New Jersey action at some
detriment to itself. The relevance of this point is not

altogether clear. Finally, Defendant argues that its
concern that Plaintiff would file suit ultimately turned
out to be well-founded. While the imminent threat of
a suit is relevant to the issue of whether a case or
controversy exists, *see Norfolk Southern Railway Co.
v. Guthrie, 233 F.3d 532, 534-5 (7th Cir.2000)*, such
threat does not give a potential defendant license to
file a preemptive declaratory judgment suit in a
forum of its own choice. Defendant all but admits
that it filed the New Jersey action purely as a way to
select the forum for the resolution of Plaintiff's
claims. Such a suit is not a legitimate use of the
Declaratory Judgment Act; and, thus, Defendant's
first-filed New Jersey action will have no bearing on
the resolution of this motion to transfer.

*Transfer under 28 U.S.C. § 1404(a)*

**\*3** Where a suit is filed with proper venue, a federal
district court may "for the convenience of the parties
and witnesses, [and] in the interest of justice ...
transfer any civil action to any other district or
division where it might have been brought." *28 U.S.C.
§ 1404*(a); *Coffey v. Van Dorn Iron Works, 796 F.2d
217, 219 (7th Cir.1986)*(*Coffey* ). Although *§ 1404*(a)
limits consideration for transfer to three factors-
convenience of the parties, convenience of the
witnesses, and the interest of justice-district courts
have broad discretion in the interpretation and
weighing of these factors, which serve more as
guideposts for analysis than as rigid requirements.
*See Coffey,* 796 F.2d at 719-20;*Chicago R.I. & P.R.
Co. v. Igoe,* 220 F.2d 299, 304 (7th Cir.1955), *cert
denied,*350 U.S. 822, 76 S.Ct. 49, 100 L.Ed. 735
(1955); *Van Dusen v. Barrack, 376 U.S. 612, 622, 84
S.Ct. 805, 11 L.Ed.2d 945 (1964)*(*Van Dusen* ). A
lesser showing of inconvenience is required under *§
1404*(a) than under the traditional doctrine of *forum
non conveniens. Coffey, 796 F.2d at 220;Piper
Aircraft Co. v. Reyno, 454 U.S. 235, 253, 102 S.Ct.
252, 70 L.Ed.2d 419 (1981)*. The movant bears the
burden of establishing, by reference to particular
circumstances, that the alternative forum is clearly
more convenient, *Coffey, 796 F.2d at 219-20*.

*Convenience of the Parties and Witnesses*

In evaluating convenience of the parties, the district
court considers five factors: (1) plaintiff's initial
choice of forum; (2) the situs of material events; (3)
the relative ease of access to sources of proof; (4) the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

convenience of the witnesses to be called to testify in the case; and (5) the convenience of the parties themselves. *Plotkin v. IP Axess, Inc.,* 168 F.Supp.2d 899, 902 (N.D.Ill.2001)(*Plotkin* );*Amoco Oil Co. v. Mobil Oil Corp.,* 90 F.Supp.2d 958, 960 (N.D.Ill.2000)(*Amoco* );*also see Georgouse v. NaTec Resources, Inc.,* 963 F.Supp. 728, 730 (N.D.Ill.1997); *APV North America, Inc. v. Transindustrial Development Corp.,* 2006 WL 51169 *1, *4 (N.D.Ill.2006)(*APV* ).

The plaintiff's choice of forum is generally entitled to substantial weight, especially when it is the plaintiffs home forum. *Plotkin, 168 F.Supp.2d at 902;Vandeveld v. Christoph,* 877 F.Supp. 1160, 1167 (N.D.Ill.1995). However, where the plaintiff's choice of forum has a relatively weak connection with the operative facts giving rise to the claim or is not the plaintiff's home forum, the deference traditionally given to that selection is decreased. *Plotkin,* 168 F.Supp.2d at 902;*Bryant v. ITT Corp.,* 48 F.Supp.2d 829, 831 (N.D.Ill.1999); *Von Holdt v. Husky Injection Molding Systems, Ltd.,* 887 F.Supp. 185, 188 (N.D.Ill.1995); *APV,* 2006 WL 51169 at *5.

In the instant case, Plaintiff has chosen its home forum to litigate this dispute. However, the connection between this district and the facts giving rise to Plaintiff's claim are relatively weak. While Plaintiff claims that Defendant visited, telephoned and sent correspondence, purchase orders and invoices to its headquarters in Illinois, it is undisputed the great majority of the SMCA sold by Defendant to Plaintiff never left New Jersey during the course of the transactions. It was delivered from Defendant's New Jersey facility to Plaintiff's New Jersey facility. All things considered, the commercial dealings between the parties have closer ties to New Jersey than they do to Illinois. Additionally, Defendant's receipt of the MCAA settlement funds, a central point in Plaintiff's claims, has no connection to Illinois, These funds resulted from a settlement of a case litigated in the District of Columbia, were paid by foreign and domestic corporations, none of which have links to Illinois, and were paid to Defendant, a New Jersey corporation. Thus, while Plaintiff's choice of forum is given some deference, that deference is lessened due to the somewhat weak connections between this district and the facts giving rise to this case.

*4 For similar reasons, considerations of the situs of material events and the sources of access to proof argue in favor of New Jersey as the more convenient venue. The MCAA settlement funds were paid to Defendant in New Jersey and have no connection to Illinois, Defendant's decisions regarding pricing and whether to pass on any price increase resulting from the conspiracy were made in New Jersey, and any proof of such pass-on would be found there as well. Thus, these two factors argue in favor of transfer.

Consideration of the convenience for the witnesses and the parties themselves also favors transfer to a limited extent. Whereas Defendant has no place of business in Illinois, Plaintiff has a facility in New Jersey. Thus, none of Defendant's witnesses will be in Illinois; but some of Plaintiffs witnesses may be in New Jersey. Furthermore, Plaintiff cannot reasonably claim that New Jersey is an overly inconvenient forum, considering the amount of business that it does in the state.

For the above reasons, considerations of convenience to the parties and the witnesses weigh in favor of transfer to the District of New Jersey.

### *Interest of Justice*

In addition to considering the convenience of the parties, witnesses, and evidence in relation to the proposed forum and the present forum, the court must also consider which forum best serves "the interest of justice." *Coffey,* 796 F.2d at 220;*Van Dusen,* 376 U.S. at 625. The interest of justice rubric focuses on the efficient administration of the courts, not the merit of the underlying dispute. *Coffey,* 796 F.2d at 221;*Plotkin,* 168 F .Supp.2d at 904. This analysis includes considerations such as "(1) the speed at which a case will proceed to trial, (2) the court's familiarity with the applicable law, (3) the relation of the community to the occurrence at issue, and (4) the desirability of resolving controversies in their locale." *Plotkin,* 168 F.Supp.2d at 904;*APV,* 2006 WL 51169 at *6;*see Macedo v. Boeing Co.,* 693 F.2d 683, 690 (7th Cir.1982) (discussing public interest factors of transfer analysis). Even where the convenience of the parties and witnesses may call for a different result, the "interest of justice" component may be determinative in particular cases. *Coffey,* 796 F.2d at 220;*see e.g., Lemke v. St. Margaret Hosp.,* 593 F.Supp. 25 (N.D.Ill.1983).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The two most relevant statistics in determining the speed at which a case is likely to proceed to trial are (1) the median number of months from filing to disposition for civil cases and (2) the median number of months from filing to trial for civil cases. *Plotkin, 168 F.Supp.2d at 904;Amoco, 90 F.Supp.2d at 962.* For the period ending September 30, 2006, the median time from filing to disposition for civil cases was 6.5 months in the Northern District of Illinois and 8.2 months in the District of New Jersey. *See* Admin. Office of the U.S. Courts, FEDERAL COURT MANAGEMENT STATISTICS (2006), *available at* http:// www.uscourts.gov/cgi-bin/cmsd2006.pl. The median time from filing to trial for civil cases was 26.4 months in the Northern District of Illinois and 33.0 months in the District of New Jersey. These figures indicate that the case would progress slightly faster in the Northern District of Illinois. Thus, this factor weighs against transfer.

**\*5** The next consideration under the interests of justice rubric is the court's familiarity with applicable law. The parties disagree as to what law applies to Plaintiff's unjust enrichment claim. Plaintiff contends that Illinois law will apply, while Defendant argues that New Jersey law applies. A federal court exercising diversity jurisdiction applies the choice of law doctrines of the state in which the court sits. *See ECHO, Inc. v. Whitson Co.,* 52 F.3d 702, 706 (7th Cir.1995)*citing Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).*"Ordinarily, Illinois follows the Restatement (Second) of Conflict of Laws (1971) in making choice-of-law decisions."*Chapman and Associates, Ltd. v. Kitzman,* 193 Ill.2d 560, 251 Ill.Dec. 141, 739 N.E.2d 1263 (2000). Under Section 221 of the Restatement, a court applies the law that has the most significant relationship to the occurrences and the parties. According to the Restatement, the contacts to be taken into account include:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicile, residence, nationality, place or incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Restatement (Second) Conflict of Laws § 221 (1971).

For purposes of resolving the motion to transfer only, an analysis of these factors point towards New Jersey as the state with the most significant relationship to the parties and occurrences. The relationship between the parties was centered in New Jersey. The bulk of the SMCA sold by Defendant to Plaintiff, over 95 percent, never left New Jersey. The Illinois-related aspects of the relationship raised by Plaintiff, such as Defendant's visiting and telephoning Plaintiff's Illinois offices and drawing payment from an Illinois bank, do not outweigh that fact.

Consideration of where the alleged enrichment was received also supports the application of New Jersey law. Plaintiff argues that Defendant was unjustly enriched when it received the portion of the MCAA settlement that should allegedly go to Plaintiff. The MCAA settlement was received by Defendant in New Jersey.

The place where the act conferring the enrichment was done, i.e., the settlement of the MCAA class action, supports the application of neither Illinois nor New Jersey law, since the case was settled in the District of Columbia.

Consideration of the domicile, residence, nationality, place of incorporation and places of business of the parties supports the application of New Jersey law. Defendant is a New Jersey corporation with its primary place of business in New Jersey. Defendant does not have a place of business in Illinois. By contrast, although Plaintiff has its headquarters in Illinois, it does have a place of business in New Jersey, which was at the center of the relationship between the parties. Thus, this factor supports the application of New Jersey law.

**\*6** The final consideration is where a physical thing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                    Page 5
Slip Copy, 2007 WL 2908818 (N.D.Ill.)

substantially related to the enrichment, in this case
the SMCA, was located at the time of the enrichment.
At the time of the enrichment-the time at which
defendant received the proceeds from the MCAA
settlement-the SMCA was likely no longer in any
centralized location, having been distributed through
the channels of commerce. However, at the time of
the commercial transactions that Plaintiff allege
entitle it to a portion of the MCAA settlement, the
SMCA was primarily located in New Jersey. Thus,
this factor weighs in favor of New Jersey law.

Overall, the application of Section 221 of the
Restatement indicates that New Jersey law will apply
to Plaintiff's claims. As the Court for the District of
New Jersey is more familiar with New Jersey law,
this factor argues that the transfer of the case would
be in the interests of justice.

Neither consideration of the relation to the
community to the occurrences at issue nor the
desirability of resolving controversies in their locale
weighs in favor of litigating this matter in
IllinoisPlaintiff seeks to recover a portion of a
settlement reached in the District of Columbia and
paid to a company in New Jersey. Any interest that
the Illinois community may have in resolving this
controversy within this district is more than balanced
out by the similar interests of New Jersey, where the
dealings between the parties were centered.

## CONCLUSION

In light of the factors discussed above, Defendant's
motion to transfer is granted. Case No. 07 C 2976 is
transferred to the District of New Jersey.

N.D.Ill.,2007.
Stepan Co. v. Callahan Chemical Co.
Slip Copy, 2007 WL 2908818 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.